1          MR. WESTON:  Judge, I think for the sentencing

2    memorandums, I think I agree with the United States in that

3    aspect.  I think we both pled our cases in the sentencing

4    memorandum.  Our objection is, at sentencing, self-defense is

5    allowed at sentencing, even though as to the charge and guilt

6    or innocence it is not.

7          And we submit to the Court, when the Court hears all

8    of the evidence, it will find that some self-defense measures

9    do apply, and what to do with that is a question for the Court

10   to do.  As we said in the memorandum, the Court can do

11   anything from not counting it at all to find manslaughter

12   applies and anything else the Court deemed appropriate based

13   on the evidence that what we believe the Court will do so

14   based on the evidence.

15          THE COURT:  Thank you, Mr. Weston.

16          The witness may bring the firearm up with him.

17          MR. MILLER:  Thank you, Your Honor.

18           WILLIAM ENGLE, GOVERNMENT'S WITNESS, SWORN

19                        DIRECT EXAMINATION

20          THE COURT:  Good afternoon.

21          THE WITNESS:  Good afternoon, sir.

22   BY MR. MILLER:

23   Q    Sir, for the record, would you please introduce yourself

24   to the Court by stating your name and position?

25   A    Yes.  My name is Detective William Engle.  I'm a Roanoke


DEFENDANT'S
EXHIBIT

Engle – Direct

```
 1  City detective.  I also am assigned as a task force officer
 2  with the Alcohol, Tobacco, Firearms section the federal
 3  government.
 4  Q    How long have you been involved in law enforcement?
 5  A    I've been employed going on 29 years.
 6  Q    Can you explain to the Court your involvement in this
 7  case?
 8  A    Yes.  Before I came on ATF, I was the second on the
 9  investigation of this case on Eastern Avenue.
10  Q    And that was second to another detective while you're
11  still assigned to Roanoke City?
12  A    Yes, sir.
13  Q    And then did you maintain as a lead investigator when you
14  transferred as a task force officer for ATF?
15  A    Yes, sir, that's correct.
16  Q    Can you explain to the Court, in general terms, the scope
17  of the investigation that captures this particular case?
18  A    The scope of this investigation, Your Honor, it
19  encompassed a homicide, drugs, violence, and firearms.
20  Q    And incidents that expand beyond what's charged in this
21  case?
22  A    That is correct.
23  Q    Approximately how many witnesses have you interviewed,
24  roughly, as part of the investigation into the shooting on
25  July 10th of 2018?
```

Engle - Direct

```
 1  A    Myself and the lead detective interviewed well over 50 to
 2  70 individuals in reference to this case.
 3  Q    Three defendants have been charged.  You've had an
 4  opportunity, to some extent or another, to speak with all
 5  three?
 6  A    Yes.
 7  Q    Fair to say that Defendant Chad Custer is the one you
 8  spoke most often, most frequently to?
 9  A    That is correct.
10  Q    Is it fair to say your communication with Mr. Harvey has
11  been fairly narrow and limited?
12  A    Yes.
13  Q    How many other witnesses were inside 1642 Eastern Avenue
14  the night this shooting occurred?
15  A    There was a total of five.
16  Q    So the three defendants and two other witnesses?
17  A    That is correct.
18  Q    You've also talked to those two witnesses?
19  A    Yes, I have.
20  Q    Our victim is Jake Aldridge, correct?
21  A    That is correct.
22  Q    How many individuals were with Jake Aldridge, in his car,
23  just prior to the shooting incident?
24  A    There would be four more other than Mr. Aldridge.
25  Q    Five total?
```

Engle - Direct

1  A    Yes.

2  Q    Have you had occasion to talk to those four that got out

3  of his vehicle?

4  A    Yes, they were interviewed.

5            THE COURT:  I'm sorry, they were what?

6            THE WITNESS:  They were interviewed.

7            THE COURT:  Interviewed.  Okay.

8  BY MR. MILLER:

9  Q    So all four that were with him that night in his vehicle

10  were identified and interviewed?

11  A    Yes, sir.

12  Q    So I want to start by talking about the shooting that

13  night.

14            MR. MILLER:  Can we pull up Government's Exhibit 1,

15  please?

16  BY MR. MILLER:

17  Q    So, Detective, I understand that you have any number of

18  pictures and videos and diagrams.  Is it fair to say that

19  every picture and video is a fair and accurate representation

20  of what they depict?

21  A    Yes, sir.

22  Q    This particular picture, Government's Exhibit 1 that's on

23  the screen, can you tell the Court whose vehicle this was?

24  A    This vehicle was registered to Jake Aldridge's mother,

25  but Jake was the possessor and the driver of this vehicle

Engle - Direct

1   throughout this investigation, is what that showed.

2   Q    And what time did the car come to rest in this state,

3   approximately?

4   A    It was in the evening hours.  This photograph here was

5   taken the following morning, after everything was taped off.

6   Q    So the incident is the night before, July 10th, 2018?

7   A    Yes.

8   Q    And this picture is taken the next day?

9   A    That is correct.

10  Q    Based on the body cam video that you've observed, were

11  any of Mr. Aldridge's car doors open when law enforcement

12  arrived?

13  A    They were not open.  All doors were closed.

14         MR. MILLER:  Can we go to Government's Exhibit 2,

15  please.

16  BY MR. MILLER:

17  Q    And I take it that this is the same car just a different

18  angle?  Now it's from the front right side of the vehicle?

19  A    That is correct.

20  Q    So, Detective Engle, when law enforcement searched this

21  vehicle, were any firearms or shell casings found inside or

22  around this vehicle?

23  A    No, sir.

24         MR. MILLER:  Could we go to Exhibit 3?

25  BY MR. MILLER:

Engle - Direct

1  Q    I take it this is the same car, just now from a different

2  angle, the front right of the vehicle?

3  A    Yes, sir, that's correct.

4          THE COURT:  Can you go back to Exhibit 2?

5          MR. MILLER:  Yes, sir.

6          THE COURT:  I was trying -- I can't read the street

7  sign on the mailbox.

8          How far was this car -- as depicted in Government's

9  Exhibit 2, how far away is that from 1642 Eastern Avenue?

10         THE WITNESS:  It is approximately half a block.

11         THE COURT:  Half a block?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  Okay.

14  BY MR. MILLER:

15  Q    And to that point, Detective Engle, I would direct your

16  attention to the top left of this photo.  Is that the access

17  road that leads up to the row of apartment complexes where

18  1642 Eastern Avenue is?

19  A    Yes, sir.

20  Q    And later on you're going to show the Court a security

21  video, correct?

22  A    That is correct.

23  Q    Is one of these houses in this photo where that security

24  camera was from?

25  A    Yes, sir.

Engle - Direct

1   Q    And do you recall which one it was?

2   A    It is the residence that has the white chair on the front

3   porch.

4           MR. MILLER:  Can the Court see that?

5           THE COURT:  Uh-huh.  It's the residence just this

6   side of the one -- there's a large SUV in front of it?

7           THE WITNESS:  Yes, sir.

8           THE COURT:  Yeah, I see the white chair.

9           MR. MILLER:  Could we go to Government's Exhibit 3,

10  please.

11  BY MR. MILLER:

12  Q    How many phones were recovered from Jake Aldridge's car?

13  A    Two.

14  Q    Was there anything in those phones or any evidence inside

15  the car that suggested what Jake Aldridge's intentions were or

16  his passenger's on the night of July 10th, 2018?

17  A    No, sir.  Extractions were done and nothing was located

18  in those phones.

19          MR. MILLER:  Can we go to Government's Exhibit 4,

20  please.

21  BY MR. MILLER:

22  Q    Detective, am I correct that this photo is the same car,

23  different angle?  Now you can see the right driver's side rear

24  of the car?

25  A    That is correct.

Engle - Direct

1  Q    How many bullet holes can be observed in this picture?

2  A    Four.

3           MR. MILLER:  Could we please blow up that back panel,

4  please.

5  BY MR. MILLER:

6  Q    How many bullet holes do you see in the blown-up portion?

7  A    Three.

8  Q    Can you tell the Court the trajectory of the bullet that

9  went through the rear window?

10  A    Your Honor, the trajectory of this round right here is on

11  a downward angle.  It passes through the rear windshield glass

12  into the dash, the deck dash of the rear of the vehicle, and

13  enters, and it -- and it enters also into that.

14  Q    And then there's a bullet hole in the right -- excuse me,

15  the left rear panel driver's side of this car.

16           MR. MILLER:  Could we blow that up, please,

17  specifically?

18  BY MR. MILLER:

19  Q    Detective, what's the significance of this particular

20  bullet hole?

21  A    This particular round, Your Honor, enters from the angle

22  of right to left, as if the vehicle is going away.  The first

23  one comes down, the photograph that I explained.  This one

24  here is·as the vehicle is driving away.

25  Q    So it enters it from the rear?

1  A    Yes.

2         THE COURT:  It enters it from the right side going to

3  theft side?

4         THE WITNESS:  Yes, sir.  Not the left side of the

5  vehicle through.  It's from the right side going forward on

6  the vehicle.

7         MR. MILLER:  Could we go to the bullet hole that's in

8  the door panel?

9  BY MR. MILLER:

10 Q    Same thing with this particular bullet?

11 A    Yes, sir.

12 Q    And then if we --

13        THE COURT:  So it's coming from the rear of the

14 vehicle?

15        THE WITNESS:  Yes, sir, forward.

16        THE COURT:  As the vehicle is heading down the

17 street?

18        THE WITNESS:  Yes, sir.

19        THE COURT:  That's what it looked like to you?

20        THE WITNESS:  Yes.  And, Your Honor, this round here,

21 along with the next one that we will show, it fragments as it

22 goes through the vehicle.

23 BY MR. MILLER:

24 Q    And where do those fragments land in the vehicle?

25 A    Fragments from this round here, along with the next one

Engle - Direct

```
 1   that we will show, fragments go into the headrest, into

 2   Mr. Aldridge, and into the dash of the vehicle from behind.

 3   Q    So different rounds strike the vehicle from the rear and

 4   send fragments forward into the front of the car?

 5   A    That is correct.

 6   Q    And you're not sure which bullet fragmented into the

 7   headrest versus the dash, but two different bullets

 8   fragmented?

 9   A    That's correct.

10        MR. MILLER:  And just to show that, can we expand

11   that out to capture the fourth bullet hole?

12   BY MR. MILLER:

13   Q    So that went through the passenger side -- driver's side,

14   passenger -- rear passenger window into the front of the

15   vehicle?

16   A    Yes, sir.

17   Q    Okay.  Could we please go to Exhibit 5, please.

18        The items that are on the street were pulled out of the

19   car in the course of first response showing up?

20   A    That is correct.

21   Q    And I take it that the red stains inside the vehicle and

22   on the door sill there are Jake Aldridge's blood?

23   A    Yes, sir.

24   Q    I want to ask you about the scene itself.

25        MR. MILLER:  Could we pull up Exhibit 6, please?
```

Engle - Direct

1              THE COURT:  Were you there that morning?

2              THE WITNESS:  Yes, sir, I was.  I was there that

3  night.  I was there.

4              THE COURT:  Okay.

5  BY MR. MILLER:

6  Q    Detective Engle, can you tell the Court what this

7  portrays?

8  A    This portrays the Eastern Avenue block of -- 1600 block

9  of Eastern Avenue.  This right here is 1642 Eastern Avenue.

10 The one with the light and the satellite dish above it, this

11 is 1642 Eastern Avenue.

12             MR. MILLER:  Your Honor, I know the detective has put

13 a mark on the screen.  For the record, he has pointed to, on

14 Exhibit 6, the far left apartment, as displayed in the

15 picture, the upstairs bedroom which has a light on.

16 BY MR. MILLER:

17 Q    And you said that's 1642 Eastern Avenue?

18 A    Yes, sir.

19 Q    And then where in this picture approximately would Jake

20 Aldridge's car have come to rest?

21 A    I'm going to touch the screen.  It's right down in this

22 area here.

23             MR. MILLER:  And, Your Honor, for the record, he has

24 pointed to an area just left of the far lighted light pole on

25 the right side of the picture.

Engle - Direct

1          THE COURT:  Okay.  And so there's -- it looks like

2   there's an access road that runs along where those apartments

3   are up on that little bluff?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  And the vehicle came to rest just past

6   the entrance to that access road, correct?

7          THE WITNESS:  Yes, sir.

8          MR. MILLER:  Could we go to Exhibit 7, please.

9   BY MR. MILLER:

10  Q    What does this portray?

11  A    This is out front of 1642 Eastern Avenue.  It shows the

12  elevation and the street from just a different view during the

13  daytime, and the lower roadway, along with the residence --

14  the residential area and the vehicles.

15  Q    And 1642 Eastern Avenue would be this first apartment

16  building on the left?

17  A    That is correct.

18  Q    I see that there's a couch just barely partially visible

19  past the trash can?

20  A    Yes, sir.

21  Q    Does that have any significance?

22  A    That's the couch that was right out front of the Eastern

23  Avenue residence.

24  Q    1642?

25  A    Yes, sir.

Engle - Direct

1  Q    And who lived at that apartment?

2  A    At the time, it was Mr. Woods, Mr. Custer, and

3  Mr. Harvey.

4  Q    What is your estimate for the change in elevation between

5  this access road in front of the apartment building versus the

6  Eastern Avenue roadway below it?

7  A    Approximately 20 to 30 feet.

8  Q    And in this area right in front of the apartment,

9  approximately how many shell casings were recovered by law

10 enforcement?

11 A    In front of the apartment?

12 Q    Yes.

13 A    Thirteen initially located, and then two more were

14 located after the TAC team had left the area.

15 Q    Okay.  So 15 total shell casings?

16 A    That's correct.

17 Q    We're going to come back to that in just a second.

18         THE COURT:  This building is a duplex?

19         THE WITNESS:  Yes, sir.

20         THE COURT:  And the 1642 is, if you're facing it, on

21 the right-hand side?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  Is there a door in the rear?

24         THE WITNESS:  There is.

25         THE COURT:  So there is a door in the front and then

Engle - Direct

1  a door out the back?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Go ahead.

4  BY MR. MILLER:

5  Q    How many people lived at 1642 Eastern Avenue at the time

6  of the shooting?

7  A    Three that I'm aware of.

8  Q    Who were they?

9  A    Woods, Harvey, and Custer.

10 Q    The three defendants in this case?

11 A    Yes.

12 Q    Can you explain to the Court the nature of the business

13 operation that was conducted out of this apartment through the

14 course of your investigation?

15 A    Through witnesses' statements and interviews, this was,

16 basically, a fast-food style restaurant for marijuana and THC

17 products.

18 Q    Explain that.

19 A    Meaning that there was so much business and so much

20 traffic at this residence for a period of time, long period of

21 time, that people would just come and go.  They would get

22 serviced at their vehicle, they could pull up, park, walk

23 inside real quick, make their deal, walk back out and leave.

24 Q    But they wouldn't even have to go inside?

25 A    They would not.

Engle - Direct

1  Q    It was, essentially, a drive-through service for those

2  who wanted it?

3  A    Yes, sir.

4  Q    Approximately how much marijuana were they selling?

5  A    Through interviews and statements that we have obtained

6  from witnesses and individuals involved, it was approximately

7  5 pounds a day was their cutoff.

8  Q    And can you explain the relative roles of Mr. Woods

9  versus Mr. Custer, and, of course, today's defendant,

10 Mr. Harvey?

11 A    Mr. Woods was more or less the one that purchased all of

12 the marijuana in large quantities.  Mr. Custer and Mr. Harvey

13 assisted in the sale of what he would bring back to the

14 residence, along with -- they were experimenting, trying to

15 make dabs and extractions, THC extractions of oil in this

16 apartment.

17 Q    What is a dab?

18 A    It is a wax based THC composite that people smoke.  It's

19 an extraction of the marijuana.

20 Q    When law enforcement arrived the night of July 10th,

21 2018, what was recovered from inside the apartment?

22 A    I'm sorry, could you say that again?

23 Q    When law enforcement arrives after the shooting of Jake

24 Aldridge, what was found inside 1642 Eastern Avenue?

25 A    We located weapons, ammunition, U.S. currency, and

Engle - Direct

```
 1  marijuana and other narcotics.

 2  Q    How many firearms?

 3  A    Three inside the residence.

 4  Q    What three firearms were recovered that night?

 5  A    A Ruger LC9 pistol, 9mm; a bolt action .243 deer rifle

 6  with a scope; and a double-barrel shotgun that had been sawed

 7  off quite significantly, way below the legal limit.

 8  Q    How much marijuana, approximately, was still in the

 9  apartment?

10  A    It was over -- over a pound and a half.  It was almost

11  2 pounds of marijuana in the residence still.

12  Q    And approximately how much cash?

13  A    Approximately 20 -- $2,000, $2,500, right in that area.

14  Q    Do you recall how much ammunition was still in the house?

15  A    It was over a hundred rounds of ammunition, various

16  calibers.

17  Q    You mentioned previously that there were two witnesses

18  inside the house at the time of the shooting?

19  A    Yes, sir.

20  Q    And you've interviewed both?

21  A    Yes.

22  Q    And you're aware that both testified before the grand

23  jury?

24  A    Yes, I am.

25           MR. MILLER:  Your Honor, the government would offer
```

Engle - Direct

```
 1   the grand jury transcript to the Court of those two

 2   individuals.  I believe that's Government's Exhibit 30 and 31

 3   that we uploaded to Box.

 4              THE COURT:  Any objection, Mr. Weston?

 5              MR. WESTON:  No, Your Honor.

 6              THE COURT:  The Court has already read it.

 7              MR. MILLER:  Thank you, Your Honor.

 8         (Government's Exhibit Numbers 30 and 31 were received.)

 9   BY MR. MILLER:

10   Q    So, Detective Engle --

11              THE COURT:  Those are two women?

12              MR. MILLER:  Two women, Your Honor.  I don't want to

13   use their full names if the Court is okay --

14              THE COURT:  No, that's fine.  I read their testimony

15   yesterday.

16              MR. MILLER:  I will refer to them as OR as one

17   witness for Oscar Romeo, being the military phonetic, and the

18   other one has the same initials as the victim in this case,

19   JA, but I'll refer to her as female JA, Your Honor, if that's

20   appropriate.

21              THE COURT:  That's fine.

22              MR. MILLER:  Thank you, Your Honor.

23   BY MR. MILLER:

24   Q    So, Detective Engle, what did those two witnesses

25   describe to you about the aftermath of the shooting?
```

Engle - Direct

1  A    They both described to me that after the shooting had

2  ceased, there was a lot of commotion in the apartment, and

3  Mr. Harvey went with the girls in a separate vehicle.  They

4  all were gathering things and leaving.

5       Mr. Custer and Mr. Woods collected firearms and money and

6  narcotics and placed them in a different vehicle and they all

7  left.  And they were not on scene upon arrival of law

8  enforcement, and law enforcement did not take -- roughly less

9  than three minutes to respond, because there was multiple

10 calls because of the multiple shots in the area.

11 Q    But despite that, there were still three firearms, a

12 pound and a half, almost two pounds of marijuana, a bunch of

13 ammunition and a bunch of money left behind?

14 A    Yes, sir.

15 Q    How many firearms have you recovered in the course of

16 your investigation that were taken away from 1642 that night?

17 So beyond the three that were left behind, how many additional

18 ones have you recovered?

19 A    We've recovered nine, nine firearms from -- that were

20 believed to be in 1642 Eastern Avenue.

21 Q    All right.  We'll come back to that in just a second.

22      You mentioned a pound and a half marijuana, thereabouts,

23 was found.  Were any other narcotics found inside 1642 Eastern

24 Avenue by law enforcement?

25 A    Yes, sir.  There was some ketamine that was located,

Engle - Direct

1  ketamine powder that was located in the residence.

2  Q    And I take it that that is a Schedule III controlled

3  substance?  It's essentially a tranquilizer of some sort?

4  A    Yes, sir, it is a Schedule III.

5  Q    If we could, Detective, I understand that there was a

6  security video of a neighbor that captured the before and

7  after of this shoot-out?

8  A    Yes, sir.

9         MR. MILLER:  If we could please go to Exhibit 9.

10  BY MR. MILLER:

11  Q    So, Detective, can you describe for the Court what this

12  video portrays?

13  A    Yes, sir.  This video is going to show that residence

14  that I noted earlier where the camera was.  It shows the

15  entrance to the service road that goes up to 1642, and it also

16  shows the lower road of Eastern Avenue in that 16- -- right at

17  the 1700 block break.

18  Q    And what is going to be in the video?

19  A    In the video is going to be Mr. Aldridge's car that comes

20  up the driveway or the service road and passes through the

21  frame and goes out of sight.  Then you will see an individual

22  within seconds run underneath that camera, and then you will

23  see two other individuals on the opposite side of the roadway

24  running along the fence, between vehicles passing through.

25  Then you will see another individual run right down the middle

Engle - Direct

```
 1   of the service road in a full sprint away from 1642.  And then

 2   approximately 40 seconds later you will see Mr. Aldridge's

 3   vehicle come back into the frame, coming back from right to

 4   left, as it starts to cross the center of the road before it

 5   strikes a vehicle that's parked on the side of the road and

 6   comes to rest.

 7   Q    And striking the vehicle is off the camera view?

 8   A    That is correct.

 9   Q    As well as where the vehicle comes to rest?

10   A    Yes.

11   Q    Can you see flashes and reflections in the trees from the

12   crash?

13   A    Yes, you can.

14        MR. MILLER:  Your Honor, at this time I would like to

15   play this video for the Court.

16        THE COURT:  Hold on a second.  Let me ask you a

17   question.  You said that the vehicle goes up the service road?

18        THE WITNESS:  Yes, sir.

19        THE COURT:  Goes up that little hill?

20        THE WITNESS:  Yes, sir.

21        THE COURT:  When it comes back, does it come down the

22   service road or does it come down Eastern Avenue?

23        THE WITNESS:  It comes down Eastern Avenue.

24        THE COURT:  So it has to go --

25        THE WITNESS:  Out the other end of the service road.
```

Engle - Direct

```
 1           THE COURT:  And then head back --

 2           THE WITNESS:  Then it comes back.

 3           THE COURT:  All right.  I've got that.  Go ahead.

 4           MR. MILLER:  Thank you, Your Honor.

 5      (Video is played.)

 6  BY MR. MILLER:

 7  Q    Detective, this car that's coming into view right now

 8  would be Jake Aldridge's car?

 9  A    Yes.

10  Q    And I note for the record it's 9:47:28.

11       This next car on Eastern Avenue is just a random car,

12  correct?

13  A    That's correct.

14  Q    That's 9:47:42 on the clock on the video.

15       We should be watching the bottom right of the screen,

16  Detective; is that accurate?

17  A    Yes, it is.

18  Q    And that was the first person to run away from 1642?

19  A    Yes, sir.

20  Q    And for the record, that was about 9:48:20.

21       This is just a random car that's just driving down

22  Eastern, correct?

23  A    That is correct.

24  Q    Presumably, there is a shoot-out occurring as these two

25  cars drive by?
```

Engle - Direct

```
 1   A     Yes, sir.
 2   Q     And now we're going to watch the top of the screen, top
 3   left?
 4   A     Yes.
 5   Q     And for the record, Your Honor, two people just ran by.
 6   That's about 9:48:45 on the clock.
 7         And then number four runs away?
 8   A     Yes, sir.
 9   Q     And that's 9:48:50, give or take some change.
10         Let me pause there.
11         And that was Jake Aldridge's car?
12   A     Yes, sir.
13   Q     35, 40 seconds after the last person had run by?
14   A     Yes, sir.
15   Q     And those flashes in the tree to the left of the screen
16   were indicative of the car crashing?
17   A     Yes, sir.
18   Q     In the course of your investigation, did you determine
19   who had what weapons that night on July 10th?
20   A     Yes, sir, we did.
21   Q     Can you explain to the Court which defendants had which
22   weapons?
23   A     Yes, sir.  Throughout the course of the investigation,
24   Your Honor, in interviewing individuals, along with
25   interviewing witnesses, Mr. Custer had a .45 caliber
```

Engle - Direct

1  Springfield, which he shot; Mr. Woods had a Sig Sauer 9mm,

2  which he had shot; Mr. Harvey had the Ruger LC9 pistol, which

3  he had shot.  After he had emptied that firearm, he returned

4  into the house and obtained the IWI Tavor, which is chambered,

5  5.56 caliber.  It's a rifle with lasers on it.

6  Q    And that is the one you brought to court today?

7  A    That is the one I brought to court today.

8  Q    If you don't mind, would you hold it up, being very

9  careful to -- if you don't mind, point the weapon down instead

10 of up, since there's people above us.  And can you point out

11 to the Court any laser-designating targeting devices on that

12 weapon?

13 A    The laser is right here, Your Honor, with the touch

14 button for it right here.

15 Q    And what does that do?

16 A    It projects where a round would hit by pushing this laser

17 sighting in.

18      MR. MILLER:  Can we pull up Government's Exhibit 8,

19 please?

20 BY MR. MILLER:

21 Q    And you can put that down.  Thank you, Detective.

22      This is a picture of the item you brought to court today?

23 A    Yes, it is.

24      MR. MILLER:  Your Honor, for purposes of the record,

25 I know we brought in the physical firearm, I would ask this

Engle - Direct

1    picture be substituted as evidence in today's hearing.

2            THE COURT:   Yeah.   No objection, it will be received.

3        (Government's Exhibit Number 8 was received.)

4            MR. MILLER:   Thank you, Your Honor.

5    BY MR. MILLER:

6    Q    How was this particular weapon recovered?

7    A    This firearm was recovered after multiple interviews and

8    was learned to have been sold to another individual.

9    Q    So walk the Court through that.   How does this link back

10   to Mr. Harvey, Woods, and Custer?

11   A    As we were at the house originally, Your Honor, there was

12   a box for this firearm in the bedroom of Woods and Custer.   We

13   conducted firearms traces on these firearms because we had the

14   serial numbers, make and model, because the boxes were there.

15       As we located that and conducted more interviews in

16   reference to where these weapons were, we found out that this

17   firearm, along with another firearm, had been sold to an

18   individual with the initials DM.   When we encountered DM, we

19   spoke with him and explained to him that we were looking for

20   these weapons and that he could possibly not want to be the

21   possessor of these weapons, and he voluntarily gave those to

22   law enforcement.

23   Q    So you recovered them from somebody.   Did he tell you

24   where he got them?

25   A    Yes, and it corroborated with the interviews and

1   statements that we had obtained prior to.

2   Q      And it ended up being Woods, Custer, and Harvey?

3   A      Yes.

4   Q      Can you explain to the Court the evidence that suggests

5   Mr. Harvey is the one that used that weapon that night?

6   A      Through interviews, Your Honor, of the witnesses at the

7   scene, Mr. Harvey, once he was done firing the pistol, came

8   back into the residence and obtained this firearm from the

9   residence and exited the residence with this firearm.

10  Mr. Woods was still in the residence, and he had come in

11  and gotten another firearm but never did go back out.   And

12  Mr. Custer had came back into the residence and went upstairs,

13  started getting dressed, because he had initially came out in

14  his underpants because of this altercation.   There was

15  approximately four to five rounds that were fired from this

16  firearm, as this is a very loud, distinctive firearm.   And

17  this is post all the pistols that had been emptied initially.

18  And Mr. Harvey is the only one that went outside with another

19  firearm.

20  Q      You mentioned that Mr. Harvey initially had a handgun.

21  Where was that located?

22  A      That was the firearm that was located inside of the

23  residence of 1642 Eastern Avenue, laying on the couch.

24  Q      Just inside the front door?

25  A      Yes, sir.

Engle - Direct

1  Q    And what condition was that firearm in when law

2  enforcement found it?

3  A    It had a magazine in it, the slide was locked to the rear

4  and the firearm was empty.  No ammunition was in it.

5  Q    Suggesting to you that all the ammunition was discharged

6  from the weapon?  That would be the condition it was left in

7  after the magazine was emptied?

8  A    Yes, sir.

9  Q    Approximately what is the street value of that weapon

10  that you brought to court today?

11  A    I wouldn't know what the street value would be per se,

12  but the retail value of this firearm is about $2,000, anywhere

13  from 2,000 to 2,500, depending where you purchased it from.

14  Q    The other weapons that you mentioned were discharged that

15  night, were those other weapons firearms -- were they, excuse

16  me, handguns?

17  A    Yes.

18  Q    And this would be the only rifle that you're aware that

19  was discharged that night?

20  A    Yes, that's correct.

21  Q    Did any of the handguns have a laser sight?

22  A    The LC9 did have a laser on it.

23  Q    And who had that gun?

24  A    That would be Mr. Harvey.

25  Q    That's the Ruger, LC9 Ruger?

1  A    Yes, sir.

2  Q    What did you say the name of that rifle was?

3  A    This is an IWI Tavor, T-A-V-O-R.

4  Q    And the ballistics characteristics, the velocity of the

5  bullets, how does this sort weapon compare to handguns?

6  A    The muzzle velocity on this particular firearm and this

7  particular round that it fires ranges between 26,000 feet a

8  second -- or 2600 feet a second up to 3900 feet a second.

9  Q    And how does that compare to a handgun?

10  A    Compared to a handgun, most handguns even with a Plus P

11  load, which is more powder in the cartridge casing, is twice

12  to almost three times that the highest end that you would see

13  on a lot of 940 and .45 caliber pistols.  1100 would be about

14  the max.

15  Q    Meaning that this particular weapon you brought to court

16  today has a much higher velocity of the bullet than any of the

17  handguns?

18  A    Yes.

19  Q    This shooting incident on July 10th, 2018, was this the

20  first time there had been violence at 1642?

21  A    No, sir.

22  Q    Can you explain to the Court the prior incident?

23        MR. WESTON:  Judge, I would object unless they're

24  trying to say my client was involved in that for some reason.

25        THE COURT:  Any response?

Engle - Direct

1          MR. MILLER:  My response is this prior incident will
2    inform the response of Mr. Woods, Custer, and Harvey.  And I'm
3    pretty sure I can lay that predicate for the Court if you
4    would like me to do that.
5          MR. WESTON:  Judge, he's not charged with a crime of
6    violence or prior crime of violence or knowledge of that.
7    It's not relevant to this case before this court, Judge.
8          THE COURT:  Well, I disagree.  I think it is relevant
9    because Mr. Miller suggests that it lays the predicate for
10   what happened on that particular night.  So I overrule the
11   objection.  I'll allow it.
12   BY MR. MILLER:
13   Q    This prior incident, what was the date that that
14   occurred?
15   A    The date that this occurred?
16   Q    No, the prior incident.
17   A    Thanksgiving.
18   Q    Of the year prior?
19   A    Yes.
20   Q    2017?
21   A    Yes.
22   Q    And I note for the record that the indictment has a
23   charged conduct that begins this conspiracy in November of
24   that year, 2017?
25   A    Yes.

Engle - Direct

1   Q    Can you tell the Court what Mr. Harvey and Custer's

2   relationship was with Mr. Woods back in Thanksgiving of 2017?

3   A    It was right in the November time frame that Mr. Custer,

4   who was living with his grandmother at the time, was living in

5   her garage, started selling quantities of marijuana that was

6   supplied by Mr. Woods.  Mr. Harvey was also living in that

7   garage with Mr. Custer at that time, to where both of them had

8   been assisting Mr. Woods in the sale of narcotics.

9   Q    So this prior incident of violence, did it leave any

10  indications of that prior incident in the apartment?

11  A    Yes, it did.

12  Q    And can you tell the Court what those visible signs of

13  violence were?

14  A    The visible signs of violence in that apartment, Your

15  Honor, were there was blood on the curtains there, a hole in

16  the coffee table, and there was also a hole in the wall.

17  Q    And what caused those holes?

18  A    Bullets.

19  Q    So a bullet hole through the coffee table, as well as a

20  bullet hole into the wall?

21  A    Yes, sir.

22  Q    Was there anything about the bullet hole in the wall that

23  highlighted it or emphasized it?

24  A    At one time, Mr. Woods had put tape around it, like a

25  picture frame, to highlight that there was a bullet hole in

Engle - Direct

1  the wall.

2  Q    Those indicators, the bullet hole through the coffee

3  table, the hole in the wall, the blood on the curtains, those

4  were there on July 10th, 2018?

5  A    Yes, sir.

6  Q    In the course of your investigation, did witnesses

7  describe discussions about the blood on the curtain and the

8  bullet hole in the coffee table?

9  A    Yes.  That was a topic of conversation if you came into

10 1642 Eastern to purchase or hang out and play games, video

11 games.

12 Q    So people would talk about this prior incident?

13 A    Yes.

14 Q    And can you tell the Court, given that foundation, what

15 actually happened Thanksgiving the year prior?

16 A    It was a -- several individuals came into the residence

17 of 1642 Eastern Avenue.  A young man that was staying at 1642

18 Eastern Avenue had been shot multiple times.  He had returned

19 fire while he was in the apartment being shot and beaten, and

20 an individual had died as a result of that.

21 Q    All right.  So two people shot inside 1642 during that

22 Thanksgiving 2017 incident?

23 A    Yes.

24 Q    Inside the apartment?

25 A    Yes.

Engle - Direct

1  Q    One of them eventually died from those wounds; although

2  they made it outside the apartment before they died?

3  A    Yes.

4  Q    And then one of the residents of 1642 Eastern Avenue also

5  was shot multiple times but survived?

6  A    That is correct.

7  Q    What did witnesses describe to you the impact of that

8  prior incident on Woods, Custer, and Harvey going forward?

9  A    They described the individuals would definitely point it

10  out and brag about it to show how tough they were to anybody,

11  basically, that they didn't have a very close relationship

12  with that would come in to purchase.  You know, like they

13  were -- it was a, you know, we run this place.

14  Q    So you described earlier how customers of this illegal

15  drug operation could just simply drive through, correct?

16  A    That's correct.

17  Q    But also there was business inside the apartment?

18  A    Yes, there was.

19  Q    How did witnesses describe how business was conducted in

20  the living room area?

21  A    It was described as -- a lot of people stated it was a

22  sloppy operation because there were large quantities of

23  marijuana that would be on the table, there would be guns

24  laying on the table, cash laying on the table, that you could

25  just walk in, ask them -- tell them what you wanted, they

Engle – Direct

1  would weigh it out, measure it, take your money and you can

2  walk right back out.

3  Q    Where were firearms kept?

4  A    Firearms were kept on the coffee table.  Through

5  interviews and witness statements, individuals -- all three

6  individuals, Woods, Custer, and Harvey, at times would carry

7  firearms during these transactions.  And there was also

8  firearms leaned up against the wall in the living room area.

9  And in the kitchen, which it's a very open living room,

10  kitchen area in this duplex, there was a large gun safe.

11  Q    Could you describe you what mean by large gun safe?

12  A    The gun safe was about as large as your podium and about

13  a foot taller.

14  Q    For the record, I'm going to estimate this is about 4

15  feet across, and if it's a foot taller than this, it's

16  probably about 5 feet tall.  Does that sound accurate?

17  A    I would go 3 and a half by 5, if I was to guess on a gun

18  safe.  It was a very -- it was a large safe.  One person is

19  not moving it; it's multiple people.

20  Q    All right.  Thank you.

21      I want to ask you about Jake Aldridge's acquaintances.

22  You testified that there were four of them with him in that

23  car that night before they got out?

24  A    Yes.

25  Q    You've talked to all four?

Engle - Direct

1  A    Yes.

2  Q    What did those four tell you happened?

3  A    Through the course of the investigation, Your Honor, we

4  identified them.  Three of them, three of the four were caught

5  in the area post the shooting a very short time frame from

6  that.  They all stated that they had gone to Eastern Avenue to

7  do a blunt walk.

8  Q    Did you ask them what they meant by blunt walk?

9  A    Yes, I asked what is a blunt walk?  And they stated they

10  went up there to Eastern Avenue, park, listen to music, and

11  then walk and smoke marijuana.

12  Q    Did any of them admit that they fired any weapons?

13  A    They did not.

14  Q    Are there indications that that group fired weapons?

15  A    Yes, there is.

16  Q    And what are those indications?

17  A    The indications were that there were shell casings below

18  the residence, on the lower part of Eastern Avenue, directly

19  below the apartment, some shell casings that were located.

20  Q    Do you remember how many shell casings were found on

21  Eastern Avenue itself below the apartment?

22  A    Four.

23  Q    Were there indications of bullets striking 1642

24  consistent with someone firing from lower?

25  A    There was indications that bullets had been fired while

Engle - Direct

1  they were -- while they were up on the top side, and there was

2  also an indication that there was a round or two that struck

3  the house from the lower, right in front of the apartment.

4  Q    You mentioned that there were about 15 shell casings

5  found upstairs, outside on the access road, the elevated part

6  right outside the apartment, correct?

7  A    Yes.

8  Q    And how many did you say were on the roadway below?

9  A    Four.

10  Q    Okay.  Did of any these individuals, Custer, Woods,

11  Harvey, the two girls, the four that were with Jake Aldridge,

12  did anyone in this case suggest that Jake Aldridge and his car

13  was involved in any violence?

14  A    No.  No, sir.

15        MR. WESTON:  I'm going to object to that, Judge.  A

16  vehicle being driven is apparently now evidence that this

17  group in that car was engaged in a shoot-out, as I understand

18  the evidence just testified to, four casings on the ground

19  below and shots into the apartment.  To then characterize the

20  vehicle of Jake Aldridge not being involved is not in keeping

21  with that evidence, Your Honor.

22        THE COURT:  Well, I'll sustain the objection, and

23  perhaps you can rephrase it with another question.

24        MR. MILLER:  Yes.

25  BY MR. MILLER:

Engle - Direct

1  Q    So when you talked to, say, Mr. Custer, did he tell you

2  that Jake Aldridge's car was involved in the violence?

3          MR. WESTON:  Objection, Your Honor.  He drove -- the

4  evidence is he drove him there.  The person who drives people

5  to commit armed robbery is involved in armed robbery.

6          MR. MILLER:  Your Honor, that's a point for argument

7  not for --

8          THE COURT:  Yeah, I'll sustain the objection.

9          Let me ask the question.

10          THE WITNESS:  Yes, sir.

11          THE COURT:  How about this:  Was there any evidence

12  that you're aware of that any shots were fired out of the

13  vehicle that the victim was driving?

14          THE WITNESS:  There's no evidence of that, Your

15  Honor.

16          THE COURT:  Go ahead, Mr. Miller.

17          MR. MILLER:  Thank you, Your Honor.

18  BY MR. MILLER:

19  Q    Were any firearms --

20          THE COURT:  Do we know, did this vehicle come to a

21  stop in front of 1642 or did it keep driving?  Do we have any

22  idea what the vehicle did?  Once it come up the access road

23  that we saw in the video, did it stop, did it pull down below?

24  Do you know what happened to it?

25          THE WITNESS:  From statements that we obtained, Your

Engle - Direct

1   Honor, is the vehicle came up, it stopped short of 1642,

2   individuals exited the vehicle and then gunfire erupted.

3   Mr. Aldridge, I've been told, did not get out of the vehicle

4   and actually drove directly in front of where the gunfire

5   exchange was.  No one shot at his vehicle when it was within

6   2 feet of the front door.  He drove by, went down the hill,

7   and then came back through after everyone was gone.

8           THE COURT:  Some of the folks in the video are -- in

9   the foreground, two of them are in the foreground, looking

10  like they're running off the access road, right?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  And then there's two that look like

13  they're across the street, on the other side of Eastern

14  Avenue, running by some parked cars?

15          THE WITNESS:  Between parked cars and a fence, yes,

16  sir.

17          THE COURT:  Do we know, when the folks got out of

18  Mr. Aldridge's car, did everybody get out there or did -- how

19  did those folks get down the hill?

20          THE WITNESS:  All individuals that got out of the car

21  were all four of those individuals, and we got that through

22  their statements, that they got out on the top of the hill.

23  The two individuals that ran along the fence stated to us that

24  they ran along the fence.  That's how we were able to identify

25  the two that ran along the fence.  And they had fallen down

Engle - Direct

1  the hill.

2         THE COURT:  Okay.  All right.  Go ahead.  Thank you.

3  Go ahead.

4         MR. MILLER:  Thank you, Your Honor.

5  BY MR. MILLER:

6  Q    To be fair to Mr. Harvey, a gun was recovered about two

7  blocks away, consistent with the direction that Mr. Aldridge's

8  friends fled?

9  A    That is correct.

10 Q    And can you describe that weapon for the Court?

11 A    That weapon is an AR-15 platform, which is a

12 military-style rifle, but it's chambered in .22 caliber, very

13 small, tiny bullets.

14 Q    Were any .22 caliber casings found?

15 A    No.

16 Q    Again, to be fair to Mr. Harvey, there is some evidence

17 that Mr. Woods was struck or grazed by a bullet that night?

18 A    That is correct.

19 Q    Can you explain to the Court what the witnesses --

20        THE COURT:  Where was the AR-15 .22 caliber platform

21 found in relation to Mr. Aldridge's -- where Mr. Aldridge's

22 car came to rest?

23        THE WITNESS:  It was located, I believe, Your Honor,

24 in the 1800 block.  It was way down at the end of Eastern,

25 going back towards Gus Nicks, behind the houses, in the wood

Engle - Direct

```
 1  line.

 2              THE COURT:  It was further away from 1642 Eastern

 3  than where Mr. Aldridge's vehicle came to rest?

 4              THE WITNESS:  Yes, sir.

 5              THE COURT:  Okay.  All right.  Go ahead.

 6              MR. MILLER:  Thank you, Your Honor.

 7              Can we pull up Government's Exhibit 10, please?

 8  BY MR. MILLER:

 9  Q    Detective, what does this portray?

10  A    This is a diagram produced by the Roanoke City Police

11  Department evidence individuals, officers that worked there.

12  This depicts where items were struck, where items were

13  located, and where Mr. Aldridge's vehicle came to rest.

14              MR. MILLER:  Could we blow up the assortment of dots

15  that are below -- there you go.  Thank you.

16  BY MR. MILLER:

17  Q    Now, I see various markings here.  How many of these are

18  shell casings?

19  A    Four of those.

20  Q    Do you recall which numbers were shell casings?

21  A    1, 2, 5, and 6.

22  Q    So the ones that are in the roadway, Eastern Avenue

23  itself?

24  A    Yes.

25  Q    What do 3 and 7 portray?
```

Engle - Direct

1  A     They portray -- there was two lighters found, Your Honor.

2  Number 3 was found and it was, like, in a holder that you see

3  individuals, they keep a lighter on a --

4  Q     A lanyard?

5  A     -- lanyard, retention-type thing.  There was one that was

6  located there.  And then Number 7, there was another lighter

7  located there.  With this being a homicide, any items like

8  that would be collected for potential latent purposes and/or

9  DNA.

10 Q     And this diagram is at least a rough approximation for

11 where the shell casings were found in the roadway relative to

12 the building 1642 Eastern Avenue?

13 A     That is correct.

14 Q     And four shell casings found, two lighters?

15 A     Yes.

16       MR. MILLER:  If we could scroll back out, please.  If

17 we could blow up the right side.

18 BY MR. MILLER:

19 Q     I notice that there's a north-pointing compass arrow on

20 this map?

21 A     Yes.

22 Q     Is that the general location of where that video that was

23 played earlier would have been captured?

24 A     Yes.

25 Q     With the video looking down towards Eastern Avenue

Engle - Direct

1   itself?

2   A    That's correct.

3   Q    So I see --

4         THE COURT:  Probably almost south, that camera would

5   be facing almost south?

6         THE WITNESS:  Yes, sir.

7         THE COURT:  Okay.

8   BY MR. MILLER:

9   Q    I see a number of vehicles.  Can we start with the two

10  vehicles that are on the north side of Eastern Avenue?  Why

11  are those in this diagram?

12  A    It's a little fuzzy, but the very first vehicle, this one

13  right here, Your Honor --

14  Q    In the center of the page?

15  A    -- in the center of the page, that is a BMW that was

16  parked, that was struck by Mr. Aldridge's vehicle before it

17  came to rest.  And this is Mr. Aldridge's vehicle right here.

18  Q    So the second vehicle is the approximate location where

19  Mr. Aldridge's vehicle ended up?

20  A    Yes.

21  Q    And the car on the north side of Eastern Avenue is one

22  that his vehicle struck before it came to rest?

23  A    Yes.

24  Q    If I could direct your attention to south of Eastern

25  Avenue, I count five cars.  What is the significance?

Engle - Direct

```
 1  A    All five of these vehicles were struck by gunfire.

 2  Q    And then I see two homes depicted.  What is their

 3  significance?

 4  A    Both of those homes were also struck by gunfire.

 5         MR. MILLER:  And if we could, I would like to pull up

 6  Exhibit 11.

 7  BY MR. MILLER:

 8  Q    Detective Engle, am I correct that Exhibit 11 shows the

 9  house closest to 1642 that was struck by a bullet?

10  A    Yes.

11  Q    Which window on this picture was struck?

12  A    The upper left window.

13         MR. MILLER:  Can we go to Exhibit 12.

14  BY MR. MILLER:

15  Q    Same window, same house?

16  A    Yes, sir.

17         MR. MILLER:  Exhibit 13, please.

18  BY MR. MILLER:

19  Q    This would be a mid-range or close-up of that?

20  A    Yes, sir, close-up.

21  Q    Same window?

22  A    Yes.

23         MR. MILLER:  Exhibit 14, please.

24  BY MR. MILLER:

25  Q    I take it that this is the inside of that same house
```

Engle - Direct

1  which the bullet passed into?

2  A    This is, yes.

3  Q    And the bullet will have come from the left side window

4  that's behind the shelves?

5  A    Yes.

6  Q    And then there is going to be a bullet that's found over

7  in the windowsill of the right-hand window?

8  A    Yes.

9          MR. MILLER:  If we could go to the next exhibit,

10  please, 15.

11  BY MR. MILLER:

12  Q    This is the window that was struck initially?

13  A    Yes.

14  Q    Exhibit 16, close-up of the same photo?

15  A    That's correct.

16  Q    And what does this show you as far as the travel of the

17  bullet?

18  A    This shows that the bullet comes through the window,

19  through the venetian blinds, and hits the frame just inside

20  the window and then travels through the room.

21  Q    It actually exposes the metal of the window frame?

22  A    Yes.

23          MR. MILLER:  Can we go with to Exhibit 17, please.

24  BY MR. MILLER:

25  Q    I take it that this is the opposite view where the bullet

Engle - Direct

1   essentially would have traveled through, but looking out from

2   the two windows towards the rest of the bedroom?

3   A    That's correct.

4         MR. MILLER:  If we could go to 18, please.

5   BY MR. MILLER:

6   Q    And this would be the window where a bullet was

7   located --

8   A    Yes.

9   Q    -- on the other side of the room?

10  A    Yes, sir.

11        MR. MILLER:  19, please.

12  BY MR. MILLER:

13  Q    That would be the bullets that were recovered inside of

14  that house?

15  A    That's correct.

16  Q    This bullet is generally consistent with which firearm?

17  A    The Ruger LC9.

18  Q    The one that Mr. Harvey fired?

19  A    Yes.

20  Q    That also had a laser site?

21  A    Yes.

22        MR. MILLER:  If we could go to the second house,

23  Exhibit 20, please.

24  BY MR. MILLER:

25  Q    This would be a side bedroom window of the house next

Engle - Direct

1  door to that first house?

2  A    Yes.

3  Q    One house further away from 1642?

4  A    Yes.

5         MR. MILLER:  Could we go to Exhibit 21.

6  BY MR. MILLER:

7  Q    Now, I note that the blinds have been pulled up and the

8  curtain has been pulled back.  That was a change from the

9  first picture?

10 A    Yes.

11        MR. MILLER:  Can we dial in on the curtain?

12 BY MR. MILLER:

13 Q    Detective, it looks like these were moved back to show

14 the bullet coming through the glass?

15 A    That is correct.

16 Q    It appears to be a bullet hole through that curtain?

17 A    Yes.

18        MR. MILLER:  If we could go to 22, please.

19 BY MR. MILLER:

20 Q    This is a close-up of that same piece of glass?

21 A    Yes.

22 Q    And the house that we're seeing was the other house that

23 we talked about earlier?

24 A    Yes.

25 Q    And these are some of the cars that were struck?

Engle - Direct

1   A     Yes.

2            MR. MILLER:  Can we go to 23, please.

3   BY MR. MILLER:

4   Q     This would be the bedroom of the second house that was

5   hit?

6   A     That's correct.

7            MR. MILLER:  Could we go to the left side of that

8   bed, please.

9   BY MR. MILLER:

10  Q     What is that next to the bed?

11  A     Those are infant diapers and medicine, things like that,

12  on the shelf.

13           MR. MILLER:  Can we go to Exhibit 24, please.

14  BY MR. MILLER:

15  Q     This is back to the window, looking at the rest of that

16  same bedroom?

17  A     Yes.

18  Q     Diapers there on the right side?

19  A     Yes.

20  Q     And is there anything in this picture that you note?

21  A     On the wall, next to the third cartoon character down,

22  there's a hole in the wall.  It's a bullet hole.

23           MR. MILLER:  Can we go to 25, please.

24  BY MR. MILLER:

25  Q     And that's the bullet hole you're referring to?

Engle - Direct

```
 1  A    Yes, sir.

 2           MR. MILLER:  Can we go to 26.

 3  BY MR. MILLER:

 4  Q    What does this exhibit show?

 5  A    This is where that bullet had passed through the wall and

 6  fallen into the -- both walls and went into the stairwell of

 7  the residence.

 8  Q    So it went through the bedroom, through the wall, and

 9  pierced through the inside wall, inside the house, to the

10  stairwell?

11  A    Yes.

12           MR. MILLER:  Can we go to 27, please.

13  BY MR. MILLER:

14  Q    And this is a bullet that's recovered on the staircase

15  itself?

16  A    Yes, it is.

17  Q    Okay.  Can you describe for the Court the nature of Jake

18  Aldridge's injuries?

19           THE COURT:  Could we go back to Exhibit 10, please?

20           MR. MILLER:  Yes, Your Honor.

21           THE COURT:  All right.  Over here on the right-hand

22  side of this exhibit where these cars are, I'm talking about

23  the south side of Eastern Avenue --

24           THE WITNESS:  Yes, sir.

25           THE COURT:  -- where the cars are that were hit and
```

Engle - Direct

1  where the two houses were that we've just seen all those

2  pictures of --

3          THE WITNESS:  Yes.

4          THE COURT:  -- are there any shell casings found

5  anywhere in this area?

6          THE WITNESS:  None whatsoever, sir.

7  BY MR. MILLER:

8  Q    Could you explain the efforts that law enforcement went

9  to to try to find shell casings?

10 A    Yes, sir.  We had all of the detective bureau out, which

11 at the time was roughly 20 detectives, along with patrol still

12 on scene.  We had pulled the recruits that were in the police

13 academy and had them out there, along with the evidence

14 technicians got out metal detectors to try to locate any and

15 all casings, not just in this area but also in front of 1642,

16 because it was grass covered, it was fairly thick, so people

17 were out -- we were on our hands and knees looking for any and

18 all casings that we could locate.

19 Q    And the ones you found on Eastern Avenue were four, down

20 in the roadway itself?

21 A    Yes.

22 Q    After all that effort?

23 A    Yes.  We didn't find any -- any others.

24 Q    I was going to ask you about Jake Aldridge's injuries.

25 Could you briefly describe what those were?

1  A    As I stated earlier, Mr. Aldridge was struck in the back

2  of the head from fragments of a round.  The round that passed

3  through the vehicle was a high velocity round and it came from

4  a rifle.

5        MR. MILLER:  Your Honor, I would offer the medical

6  examiner's report, which is Exhibit 28, as evidence.

7        THE COURT:  I assume, Mr. Weston, you don't have any

8  objections to any of these?

9        MR. WESTON:  No, Your Honor.  I received that in

10  discovery.

11        MR. MILLER:  And, Your Honor, I'd ask for everything

12  that's been offered so far and is going to be offered as

13  evidence in this case.

14        THE COURT:  It will be received without objection.

15        MR. MILLER:  Thank you, Your Honor.

16      (Government's Exhibit Number 28 was received.)

17  BY MR. MILLER:

18  Q    Detective, I am correct that on page 3 of the medical

19  examiner's report it does detail that the fragments that

20  ultimately killed Jake Aldridge were consistent with a high

21  velocity firearm?

22  A    That is correct.

23  Q    Okay.  Thank you.

24        MR. MILLER:  Your Honor, for efficiency and

25  conveniency, there is other information that this witness will

```
 1  know relative to sentencing but not necessarily for the murder
 2  cross-reference.  Would you prefer to bifurcate, have him come
 3  back on, or go through the rest of his testimony?
 4          THE COURT:  What would the defendant prefer?
 5          MR. WESTON:  Judge, I would rather go through it all.
 6  I'm going to have cross-examination.  It will probably make
 7  cross-examination easier not to bifurcate them.
 8          THE COURT:  Okay.  You may ask whatever questions you
 9  want of this witness that's relevant to the issue of
10  sentencing.
11          MR. MILLER:  Thank you, Your Honor.
12  BY MR. MILLER:
13  Q    Detective Engle, I do want to ask you what you learned
14  from your investigation about a prior interaction of Jake
15  Aldridge with Woods, Custer, Harvey that same day, July 10th,
16  2018.
17  A    Yes, sir.  That same day Mr. Aldridge, along with two
18  other individuals, had gone to the Eastern Avenue residence to
19  attempt to purchase approximately 2 ounces of marijuana.  At
20  that time, there was an argument over weight, trust issues
21  with each other, and money.  At that time, the deal did not
22  happen and Mr. Aldridge and those two individuals left.
23  Q    Were those two individuals with Mr. Aldridge again later
24  that night?
25  A    Yes, they were.
```

Engle - Direct

1   Q   They were two of the four that got out of his vehicle?

2   A   Yes.

3   Q   And approximately how much earlier had this occurred

4   prior to, say, 9:45 p.m.?

5   A   This occurred between 3:30 and 4:30 in the afternoon.

6   And then the incident occurred around 9:45 p.m.

7   Q   Okay.  Can you explain to the Court who set up that

8   marijuana deal?

9   A   That was grand jury witness OR.

10  Q   And she set it up on the inside, being at 1642 Eastern

11  Avenue?

12  A   Yes.

13  Q   And which of Jake Aldridge's friends, using initials?

14  A   DL.

15  Q   Not Jake Aldridge himself?

16  A   No.

17  Q   But he was present at the scene during that earlier

18  incident?  It was his car and two of his friends?

19  A   Yes.

20  Q   Can you tell the Court what the witnesses say

21  precipitated the shoot-out itself?

22          THE COURT:  Let's be clear.  You said his car and two

23  of his friends.  Was it Mr. Aldridge driving the same vehicle

24  on both occasions on July 10th?

25          THE WITNESS:  Yes, sir.

Engle - Direct

1              THE COURT:  Same car?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Go ahead.

4              MR. MILLER:  Thank you, Your Honor.

5    BY MR. MILLER:

6    Q    What did the witnesses say happened just prior to the

7    shoot-out?

8    A    Can you be more specific?

9    Q    Yes.  How did the shoot-out begin?

10   A    We were told by the witnesses that at the time that the

11   vehicle had returned there was brick or object that came

12   through the front window of 1642 Eastern Avenue.

13             THE COURT:  The first-floor window?

14             THE WITNESS:  Yes.

15   BY MR. MILLER:

16   Q    And then shooting began?

17   A    Yes.

18   Q    And the witnesses described it as both ways, at least

19   from inside 1642?

20   A    Yes.

21   Q    Of course, Jake Aldridge's friends claim they never fired

22   a weapon?

23   A    That is correct.

24   Q    29 years of law enforcement, how many robberies have you

25   seen started by a brick going through the window?

Engle - Direct

1    A    None.

2    Q    Do you know what --

3           THE COURT:  Did your investigation reveal whether the

4    folks on the inside or the folks on the outside started the

5    shooting?

6           THE WITNESS:  Your Honor, I can't answer that.  I

7    don't know who started it.

8           THE COURT:  Don't know.  Your investigation was

9    inconclusive; you don't know who started first?

10          THE WITNESS:  Do not.

11          THE COURT:  Okay.

12   BY MR. MILLER:

13   Q    To follow up on that, was there any conclusions you drew

14   about what Jake Aldridge's friends intended?

15   A    There was not any conclusions with supporting evidence

16   to, no.

17   Q    To be fair to Mr. Harvey, you have continued to

18   investigate those four for a Hobbs Act robbery?

19   A    That is correct.

20          THE COURT:  Did those four ever tell you that any of

21   them threw that brick or any other object through the window?

22          THE WITNESS:  No, sir.

23          THE COURT:  They're denying that as well?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.

Engle - Direct

```
 1  BY MR. MILLER:

 2  Q    Did anyone see Jake Aldridge's friends approaching 642

 3  [sic] on foot?

 4            THE COURT:  1642.

 5            MR. MILLER:  1642.  Thank you, Your Honor.

 6  A    Did anyone see them approaching on foot?

 7  BY MR. MILLER:

 8  Q    Yes.

 9  A    No.

10  Q    Was anybody sitting on the couch outside?

11  A    Mr. Harvey apparently was the individual outside on the

12  couch as the vehicle turned onto the access road, and then

13  went into the apartment.

14  Q    And what do the witnesses say Mr. Harvey said?

15  A    Mr. Harvey stated as he came through, according to the

16  witnesses, Your Honor, "That car came back."

17  Q    Okay.  You have had additional interactions with

18  Mr. Harvey?

19  A    Yes.

20  Q    After July 10th, 2018?

21  A    Yes.

22  Q    Were there any indications that Mr. Harvey, either alone

23  or with Mr. Woods and Custer, took any actions to obstruct

24  justice?

25  A    Yes, there was.
```

Engle - Direct

1  Q    Can you explain to the Court anything that was said or

2  done to witnesses?

3  A    Post the shooting incident on Eastern Avenue, it was

4  learned that the individuals went -- had gone down to the

5  lake, Smith Mountain Lake area.  During the time that they

6  were at Smith Mountain Lake, there was a discussion between

7  Woods, Harvey, and the two females.  The young ladies were

8  extremely scared.  They felt that they had been threatened and

9  told not to talk.  And there was also discussions about alibis

10  for Mr. Woods and Mr. Harvey.

11  Q    What was the nature of the threats?

12  A    Basically, that they knew where they lived and --

13         MR. WESTON:  Your Honor, I'm going to object unless

14  they're saying Mr. Harvey did this or participated in it.  My

15  understanding it was not Mr. Harvey that was making threats.

16  BY MR. MILLER:

17  Q    Did Mr. Woods make some specific threats?

18  A    Yes, he did.

19  Q    Was Mr. Harvey present when those threats were made?

20  A    Yes, he was there.

21         MR. MILLER:  Your Honor, I would offer this evidence.

22         THE COURT:  I'll overrule the objection.

23  BY MR. MILLER:

24  Q    What was the threat to the --

25         MR. WESTON:  Your Honor, again I object to this

1    unless Harvey is acquiescing or doing it.  Because Mr. Woods

2    is making threats doesn't mean Mr. Harvey agrees with them.

3            THE COURT:  The Court is going to hear the evidence.

4    Overrule the objection.

5    BY MR. MILLER:

6    Q    What was the threat to the two witnesses?

7    A    The threat was that they just needed to keep their mouths

8    shut.  They knew -- Mr. Woods had claimed that he knew someone

9    in law enforcement and he would know if they talked.

10   Mr. Harvey just went along with that and said that they needed

11   to be quiet, keep quiet.

12   Q    Was there anything about a bomb?

13   A    There was some discussion about Mr. Woods knowing how to

14   make bombs and could get bombs or something along those lines,

15   yes.

16   Q    And were any pictures sent to the girls, either one or

17   both of them?

18   A    Yes, there was pictures sent to the girls by both sides

19   of this.  When I say "both sides," Mr. Woods' side and the

20   other side of --

21   Q    Meaning one of Jake Aldridge's friends also sent --

22   A    Yes.

23   Q    And was Mr. Harvey aware that pictures were being sent to

24   the girls?

25   A    He was.  He was made aware of it.  I don't know if he was

Engle - Direct

1  aware of it at the time that it was sent.  He was made aware

2  of it after it was received and was questioned, you know, "Why

3  am I getting these?"  And his basic response to the young

4  ladies was, "Don't worry about it.  I'll take care of it."

5  Q    So he was aware of it?

6  A    Yes.

7  Q    Was a letter sent by Mr. Harvey provided to law

8  enforcement?

9  A    Yes, it was.

10 Q    Can you explain to the Court the nature of that letter?

11 A    The nature of that letter is Mr. Harvey wrote a

12 handwritten note to Mr. Woods while they were in custody, and

13 it was passed through the jail.  It basically states, Stay the

14 course of your story.  They don't have nothing on us.  I fired

15 the Ruger and emptied it and you fired into the air.  Just

16 basically stay the course.  Mr. Custer was the hothead.  He

17 had all the guns, and it also mentions K getting there.

18         MR. MILLER:  Can we pull up Exhibit 29, please.

19 BY MR. MILLER:

20 Q    So this was a letter that an inmate was asked to pass

21 from Harvey to Woods, but, instead, he gave it to his defense

22 attorney who turned it into law enforcement?

23 A    That is correct.

24 Q    Can we continue on.  And the information provided that

25 this was Mr. Harvey's handwriting?

Engle - Direct

 1  A    Yes.

 2  Q    I mention you say in the middle of the page it says, "the

 3  weed as well as K."  What does K refer to?

 4  A    Ketamine.

 5  Q    Which was located by law enforcement inside the

 6  apartment?

 7  A    That is correct.

 8  Q    And then you mentioned that there's a specific -- if we

 9  go down to the middle of the page, there's a sentence there

10  that says, "I dumped the Ruger and took off on foot."  That

11  would be the LC9 Ruger that witnesses put in Mr. Harvey's

12  hands?

13  A    That is correct.

14  Q    Which is a point of corroboration that this was, in fact,

15  Mr. Harvey that had the Ruger as well as wrote the letter?

16  A    Yes.

17  Q    It mentions a Glock further down.  "I always had a

18  Glock."  Was a Glock ever recovered from Mr. Harvey?

19  A    No, not from the 1642 Eastern address.

20  Q    Okay.

21  A    When Mr. Harvey was arrested later on the federal

22  charges, a Glock 43 was recovered.

23  Q    Okay.  So he was found in possession of a Glock later,

24  but not related to 1642 Eastern Avenue?

25  A    That's correct.

Engle - Direct

1  Q    All right.  So you mentioned you had interacted with

2  Mr. Harvey after July 10th, 2018.  Very quickly, can you

3  explain to the Court your interaction with him on

4  November 19th of that year?

5  A    Yes, sir.  Your Honor, we conducted another interview

6  with Mr. Woods -- Custer.  I'm sorry, with Mr. Custer.  We had

7  picked him up at his girlfriend's residence on Ridgefield

8  Street in Roanoke city.  Mr. Custer did not have a ride.  He

9  said he would talk with us, we just needed to come and get

10  him.  So we brought him down, we interviewed him, post the

11  interview we took him back home.  When we took him back home,

12  he didn't bring his keys with him, so he had to knock on his

13  own door to get back in his residence.  Upon knocking on the

14  door, Mr. Harvey came to the door with a firearm in his right

15  hand.  He was ordered out of the residence and secured for a

16  brief time on the front porch of that residence.

17  Q    What was that firearm?

18  A    That was a Springfield Model 1911 .45 caliber pistol.

19  Q    Were casings at 1642 Eastern Avenue on the night of

20  July 10th consistent with that particular firearm?

21  A    Yes.

22  Q    Mr. Custer admitted that he had that -- had discharged

23  that weapon on July 10th, 2018?

24  A    Yes, he did.

25  Q    And on this particular day, that was a voluntary,

Engle - Direct

1  noncustodial interview with Mr. Custer?

2  A    Yes, sir.

3  Q    And going back to the apartment, he had actually signed a

4  consent to search that Ridgefield Street address?

5  A    That's correct.

6  Q    Other than the gun that was in Mr. Harvey's hand when he

7  answered the door, what else did you discover inside that

8  other location?

9  A    We discovered another firearm in the basement section of

10 this residence.  It was Sig Sauer 9mm.  And we also discovered

11 over 80 grams of marijuana inside, along with several hundreds

12 of rounds of ammunition.

13 Q    Was that Sig Sauer firearm that was found at the second

14 location linked back to 1642 Eastern Avenue?

15 A    Yes, it was.

16 Q    And that was the firearm that supposedly Aaron Woods

17 discharged?

18 A    Yes.

19 Q    You did speak briefly with Mr. Harvey on that occasion?

20 A    Yes, I did.

21 Q    Did he make any statements regarding the nature of the

22 marijuana business at Ridgefield Street as compared to Eastern

23 Avenue?

24 A    Yes.  He compared it to the business was a whole lot

25 slower, the quality of marijuana that they had been receiving

Engle - Direct

1   from Mr. Woods was not as good of quality, and it was just

2   because of all the heat from the Eastern Avenue incident.

3   Q    In the course of your investigation, did you determine

4   that Aaron Woods left 1642 Eastern Avenue and maintained a

5   marijuana-dealing operation in a different location of Roanoke

6   city?

7   A    Yes, I did.

8   Q    And one of those locations was on Compton Avenue?

9   A    Yes, on Compton Avenue.

10  Q    In the course of that, did you have occasion to learn of

11  Mr. Harvey still associating with Mr. Woods in the marijuana

12  business?

13  A    Yes, we did.

14  Q    Can you share with the Court that information?

15  A    Yes, Your Honor.  We obtained video from an individual

16  that was with Mr. Woods of Mr. Harvey inside of the Compton

17  Avenue address holding a large bag of marijuana and hanging

18  out in the apartment with Mr. Woods.

19  Q    On the day that Mr. Harvey was arrested, did he post any

20  pictures to his social media?

21  A    Yes, he did.

22        MR. MILLER:  Can we please pull up the last two

23  exhibits.

24  BY MR. MILLER:

25  Q    This was marked as Government's Exhibit 32.  What do you

Engle - Direct

1  see of note in this picture?

2  A    That's Mr. Harvey holding a Glock firearm.

3  Q    And this picture would have been posted approximately how

4  many hours before he was arrested?

5  A    I know the other one was posted approximately two hours.

6  These came in within two or three hours of his arrest.

7         MR. MILLER:  And if we could go to the other exhibit.

8  BY MR. MILLER:

9  Q    Different social media post?

10 A    Different social media platform, different post.

11 Q    At the time of his arrest, was he found in possession of

12 that firearm?

13 A    Yes, he was.

14 Q    And what type was it?

15 A    A Glock 43.

16        THE COURT:  What day was he arrested on?

17        MR. MILLER:  September --

18        THE WITNESS:  September 26, Your Honor, I believe.

19        MR. MILLER:  -- of 2019.

20        THE WITNESS:  2019.

21        MR. MILLER:  Your Honor, if you would give me just

22 one moment.

23        THE COURT:  This video where you said showed Harvey

24 at Woods' Compton address with a bag of marijuana, was that

25 after the -- after the July 10, 2018, shooting?

Engle - Direct

1          THE WITNESS: Yes, sir, it was.

2          MR. MILLER: Your Honor, if you would give me one

3   moment to step away from the podium.

4          THE COURT: Take your time.

5          MR. MILLER: Thank you, Your Honor.

6      (Pause in the proceedings.)

7          MR. MILLER: Thank you, Your Honor.

8   BY MR. MILLER:

9   Q    Detective, in the course of the medical examiner's

10  report, was a toxicology screen performed on Jake Aldridge?

11  A    Yes, it was.

12  Q    And were any alcohol or illegal substances found in his

13  body?

14  A    No, sir, there were not.

15         MR. MILLER: Thank you very much. Please answer any

16  questions Mr. Weston or the Judge may have.

17         THE COURT: Mr. Weston, any cross?

18         MR. WESTON: Yes, Your Honor.

19         THE COURT: Nice to see you again, Mr. Weston.

20         MR. WESTON: You too, sir.

21         Judge, may I approach the witness?

22         THE COURT: Certainly.

23         MR. WESTON: I have a stack of police reports I have

24  a copy of and it might refresh his memory. Rather than do it

25  each time, I would rather have him have them to refresh.

Engle - Cross

```
 1              THE COURT:   That's fine.

 2                      CROSS-EXAMINATION

 3  BY MR. WESTON:

 4  Q    Good afternoon, sir.

 5  A    Good afternoon.

 6  Q    I handed you a stack of police reports obtained through

 7  discovery from the United States.  As we go, if you need to

 8  refresh your memory, that's why I gave them to you.  At the

 9  bottom of the page is the numbering, Bates numbering system

10  from the U.S. Attorney's Office, and I'll reference them for

11  sake of clarity if need be.

12  A    Thank you.

13  Q    I understand -- I've seen discovery is over 60-, 70,000

14  pages.  I don't expect you to remember every page, so I would

15  like you to reference them if need be.

16  A    Yes, sir.

17  Q    You were the lead investigator in this?

18  A    I was the second on this.

19  Q    You conducted dozens of interviews?

20  A    Yes.

21  Q    Produced thousands of pages of evidence?

22  A    Yes.

23  Q    Sometimes law enforcement also investigated and you would

24  then get those reports and read them as part of your

25  responsibilities?
```

Engle - Cross

```
 1  A    Yes.  There was multiple people that would add
 2  supplements to the reports.
 3  Q    Right.  You would read them too to make sure you're
 4  keeping up with the case?
 5  A    Yes.
 6  Q    There is two groups of people, people that come in a car
 7  twice to the residence 1642, correct?
 8  A    Yes.
 9  Q    They come in the afternoon, they come back at night?
10  A    Yes.
11        THE COURT:  But there's only three people the first
12  time and five people the second time?
13        THE WITNESS:  Yes, sir.
14  BY MR. WESTON:
15  Q    Right.  As part of the investigation, police officers
16  come to the scene and try and give aid, restore order, and
17  then block off the crime scene as best they can?
18  A    Yes, sir.
19  Q    And in your experience it's almost always the case that
20  when they first arrive, police aren't necessarily concerned
21  with stepping on evidence or casings or kicking something?
22  They've got to, first, restore order; second, help people;
23  then, third, secure a scene, correct?
24  A    That's correct.
25  Q    And to your knowledge in this case, then, casings and
```

Engle - Cross

```
 1   such were kicked around the street or kicked around some

 2   places?  That's just what happens in these cases before it

 3   stops and the scene is secured?

 4   A    They could have been, yes.

 5   Q    So casings, where they end up, aren't necessarily where

 6   they began?

 7   A    Possibility, yes.

 8   Q    The neighborhood canvass, if you want to start on the

 9   page, first page there, if you want to refresh your memory,

10   it's page 8.  Officers talked to neighborhood people, and

11   there was somebody that lives nearby, that states they heard

12   shots, they saw three people run from a vehicle, and this is

13   about three-quarters of the way down the page?

14   A    Yes, sir.

15   Q    That one male ran back and looked in the vehicle and then

16   ran away again, correct?

17   A    That's what it states, yes.

18   Q    So somebody came back to the vehicle for some reason and

19   then ran away?  They didn't just run away and leave the scene?

20   A    Possibly, yes.

21   Q    If you turn to the next pages, and they're numbered 17,

22   there's another witness about halfway down who lives in the

23   block.  His initials -- this is a Spanish person -- JAPA would

24   be all the initials, that person.  He observes a light-skinned

25   male not wearing a shirt run towards the vehicle and then away
```

Engle - Cross

1  from it, on Eastern, towards Thrasher Park, correct?

2  A    That's correct.

3  Q    Thrasher Park, if you continue down the street from where

4  we saw the pictures of the scene, the car ends up driving --

5  if you're looking at the picture, driving from left to right,

6  the car crashes driving left to right in the picture, right?

7  A    The car drives from right to left and it crashes on the

8  left-hand side of the roadway.

9  Q    Right.  But in the picture you're looking at, the vehicle

10  is on the right side of the picture, driving -- if it kept

11  going, it would drive off the picture to the right, the

12  crashed vehicle Mr. Aldridge was in?

13  A    No, it crashes -- it's on the left.

14  Q    It's on the left side of the road.

15  A    It comes through the frame and goes out of frame on the

16  left side.

17  Q    I'm not talking about the video.

18  A    Oh.  Okay.

19  Q    I'm talking about the picture of the crime scene, the

20  picture of the car park at rest.

21  A    Yes.

22  Q    If you want to use the video, that's fine too.  What I'm

23  suggesting, I'm saying is, these people at -- these witnesses,

24  these residents say he ran away, ran in that direction,

25  whether it's the video to the left or the picture to the

Engle - Cross

```
 1  right, they ran towards Thrasher Park, which if you keep going
 2  down, you're going to come to Thrasher Park?
 3  A    Yes, sir.
 4  Q    So somebody comes back to the vehicle, does something and
 5  runs away?
 6       Turn to the next page.
 7            THE REPORTER:  I didn't hear an answer.
 8            MR. WESTON:  I thought he said yes.
 9            THE WITNESS:  I said yes.  Yes, sir.
10  BY MR. WESTON:
11  Q    The next page is a Residential Canvass Sheet, is what
12  it's labeled.  It's 12,961 document.  Have you got that one?
13  A    Yes, sir.
14  Q    Again, somebody's address is at 1700 block of Eastern,
15  and they state they heard several shots, yelling, more shots,
16  saw a black male run away, come back to the car, get something
17  from the backseat of the crashed car, run away towards Gus
18  Nicks Boulevard, correct?
19  A    That's correct.
20            THE COURT:  I'm sorry.  That witness statement 12961
21  said got something out of the backseat of the crashed car?
22            MR. WESTON:  Yes, sir.  That Mr. Aldridge is in, that
23  would be.
24            THE COURT:  All right.
25  BY MR. WESTON:
```

Engle - Cross

1   Q    And it's true that even though, apparently, something was

2   taken out of the car by somebody, you described some things

3   left in the car.  But you did not describe for some reason on

4   direct that a white powder bag of something was found in the

5   car, wasn't it?

6   A    There was a white powder bag on the passenger's side of

7   the vehicle, that was located.  I was not asked about it, but

8   yes, there was.

9   Q    Was it tested to see what drug it was?

10  A    I do not know if it was tested.

11  Q    In your training and experience, is it consistent with an

12  illegal drug?

13  A    Yes, sir, it would be.

14  Q    Would it be consistent with cocaine?  Was it a white

15  powder substance consistent with cocaine?

16  A    Yes.

17  Q    You don't know off the top of your head right now it

18  wasn't tested to see if it was in fact cocaine?

19  A    That's correct.

20  Q    You then -- you then, with others, start doing

21  interviews.  And you interview everybody involved, like you

22  said, including the people in the car.  Is it fair to say, not

23  surprising in these kinds of cases, everybody lied?

24  A    There are going to be inconsistent and lies when you

25  interview individuals initially, yes.

Engle - Cross

```
 1  Q    And the people in the car you believe lied about their
 2  intent being there; isn't that true?
 3  A    I believe they lied in the totality of everything, but I
 4  do not know what their intent was.
 5  Q    So if you turn to the next packet I gave, it starts at
 6  page 64.  You interviewed --
 7            MR. WESTON:  Judge, I think it would be easier if I
 8  use people's names, unless the Court doesn't want me to, the
 9  witnesses' names.  I'll use initials if you want, Judge.  But
10  it may be easier -- these are the people in the car -- trying
11  to identify them by name rather than initials.
12            THE COURT:  Mr. Miller, any objection to that?
13            MR. MILLER:  Judge, whatever the Court prefers,
14  especially if it's going to clarify things.  Just a matter of
15  propriety, a prosecutor tends not to use the names of those
16  who are uncharged, that may be implicated.
17            THE COURT:  I don't have any problem.  If these are
18  the folks in the car, you can use their names if it's easier
19  to keep these straight, Mr. Weston.
20            MR. WESTON:  Thank you, sir.
21  BY MR. WESTON:
22  Q    So your investigation revealed in the car was Jacob
23  Aldridge, Devonte Joyce, Dylan Lowe, Carrington McCadden,
24  whose nickname is CJ --
25  A    That's correct.
```

Engle - Cross

1  Q    -- and a Ryan Dent?

2  A    That's correct.

3  Q    The reference I'm talking about now is your initial

4  interview around August 1st of Devonte Joyce.  Do you have

5  that document with you?

6  A    In --

7  Q    Page 64 it starts.

8  A    I have that document, yes.

9  Q    Do you recall this off the top of your head or do you

10  want a minute to read through it?

11  A    This is dated July 11th, 2018.

12  Q    Yeah.  Well, yes, the police report starts out on

13  Wednesday, July 11th, 2018, that's correct.

14  A    Yes.

15  Q    In it he claims the blunt walk that you've described.

16  Meaning we're just going to walk and smoke marijuana,

17  basically?

18  A    Yes, they were going to go up, listen to music, and have

19  a blunt walk, walk and smoke marijuana.

20  Q    But he states that down towards the bottom of that

21  page --

22        THE COURT:  At the place where they had already had

23  the altercation with the people in the afternoon.  It didn't

24  sound too credible to you, did it?

25        THE WITNESS:  No, sir.

Engle - Cross

1          THE COURT:  I didn't think so.

2          Go ahead.

3    BY MR. WESTON:

4    Q    Down towards the bottom of that page, the last full

5    paragraph, he states that when they got out of the car someone

6    runs inside that's sitting on the front stoop, and then five

7    people come out, and somebody yells, "What's up?  What's up?"

8    and then gunshots.

9    A    That's what he said, yes.

10   Q    And he further describes four people being in the car,

11   correct?

12   A    In the car in which he came in?

13   Q    Yes.

14   A    Yes.  He didn't want to give up Mr. Dent initially.

15   Q    Right.  So in your training and experience, why wouldn't

16   somebody in the car, based on your vast experience in doing

17   these investigations, not want to give up, meaning name

18   somebody else in the car?

19   A    That's not uncommon in any investigation when there are

20   other individuals.  People don't want to be labeled as a

21   snitch.  Mr. Dent was not caught that night.  Mr. Dent later

22   came to the police department and was interviewed.

23   Mr. McCadden, Mr. Lowe, and Mr. Joyce were all detained by law

24   enforcement down across from Thrasher Park at the Happy Mart.

25   So Mr. Joyce was only giving us what we had already known of

Engle - Cross

1   the individuals that were there.

2   Q    Generally, people that don't want to so-call snitch have

3   something to hide?  They don't want to implicate somebody else

4   in what might be a crime?

5   A    Possibly, yes.  I mean, marijuana at this time was still

6   illegal to possess and use.

7           THE COURT:  Well, marijuana in these quantities is

8   still illegal to possess and use.

9           THE WITNESS:  Yes, Your Honor.

10          THE COURT:  And that's under state law.  Any amount

11  is illegal under federal law.

12          THE WITNESS:  Yes, sir.

13          THE COURT:  Just so we're clear.

14  BY MR. WESTON:

15  Q    So, in your experience, generally people who don't have

16  anything to hide, that have been shot at, have you had them

17  deny that somebody is in the car when you know they were in

18  the car with them?

19  A    Yes.

20  Q    That have nothing to hide?

21  A    Yes.

22  Q    And that's just because they don't want to be a snitch?

23  A    They don't want to be a snitch, they don't want to give

24  up somebody that they consider a friend at times.

25  Q    Okay.  And if you look at the last page of that, which is

Engle - Cross

1    69, he finally admits after lengthy questioning that Jake

2    Aldridge he believes had a gun.  The first -- third -- second

3    full paragraph, about a third of the way down, a Glock .40,

4    correct?

5    A    Yes.

6    Q    And were .40 caliber ammunition spent casings found?

7    A    Yes, they were, in the roadway directly below the

8    residence.

9    Q    If you go to the next packet starting at U.S. Attorney's

10    Office Number 69, the next packet is an interview with a

11    Carrington McCadden.  It starts well down towards the bottom

12    of the page.

13    A    Yes.

14    Q    He denies knowing pretty much anybody in the car but

15    Devonte Joyce?

16    A    That's correct.

17    Q    Do you believe that to be true?

18    A    I know that Mr. Carrington and Mr. Joyce were close

19    associates, and I know -- I don't know if they knew

20    Mr. Aldridge or if they knew Mr. Dent.  I know that

21    Mr. Aldridge and the Joyce family were associates and had been

22    associates for a long time.  Mr. Joyce's older brother and

23    Jake were very good friends.

24    Q    If you look at the next page, which is Number 70, the

25    second full paragraph there he describes what's occurring

1    there.  He says they got up there, turned the lights off, guy

2    standing outside, guy ran inside looking scared, and then

3    comes outside with a gun, like, "What do y'all want?"  Is that

4    correct?

5    A    Yes.

6    Q    And asked if anybody in the car fired back or any

7    firearms, he says, "Not that I know of."  That would be on

8    page, if you're looking for it, page 71, about halfway.

9    A    Yes, sir.

10   Q    The next packet starts at discovery pages 61, and

11   attached with it, it skips a bit, but attached with it then is

12   also 72 through 75.  Do you have that?

13   A    I have 61, 72, '3, '4, and '5, yes.

14   Q    And this describes an interview around this time with his

15   mother, Renee Mitchell, with Jake Aldridge's mother, Renee

16   Mitchell, correct?

17   A    Yes.  It appears that that interview was conducted by

18   myself and Detective Dillon.

19   Q    And y'all are asking about a Ryan Dent and his

20   relationship with her son, right?

21   A    Yes.

22   Q    And she tells you she believes her son "dealing cocaine

23   at Virginia Tech and the Radford University area"?

24   A    And potentially he was involved in that, yes.

25   Q    And that Ryan Dent is a higher drug dealer?

1  A ·  Yes.

2  Q    Might that explain why somebody else in the car wouldn't

3  want to identify Mr. Dent?

4  A    Possibly, yes.

5  Q    She also describes a firearm.  That's about in the

6  middle, right around the same area; is that right?

7  A    Yes.

8  Q    And that her son was basically hiding a firearm for Dent?

9  Is that the gist of that?

10  A    That was -- that was, I believe, Ms. Mitchell's

11  understanding from the explanation she obtained from Jake.

12  But there is -- I don't believe there was any denying that

13  Jake had a firearm at one time.

14  Q    And his intent, according to this, about two weeks,

15  according to this report, was to sell that gun back to Ryan

16  Dent that was, quote, "clean."  What does "clean" mean for a

17  firearm?

18  A    In my experience with the word "clean," it means it

19  wasn't stolen and possibly hadn't been used in a crime.

20  Q    And between those committing crimes or intending to use

21  it criminally, a clean gun would be of value, wouldn't it?

22  A    It would.

23  Q    If you go to the next page, which is 72, down around the

24  bottom of the page she's describing again throughout this --

25  this is another version, I think, of that interview, she

Engle - Cross

1  describes, again we just talked about it, down towards the

2  bottom she describes that Mr. Dent was hiding out?  Do you see

3  where I'm talking about?  The last full paragraph.

4  A    At the bottom of the page?

5  Q    Right.  There's a search warrant on somebody's house in

6  Salem that had guns, cocaine, marijuana, $12,000 of cash, and

7  that caused Ryan Dent to call Jake to tell him he changed --

8  Ryan Dent changed his phone number and went into hiding,

9  correct?

10  A    That's correct.

11  Q    Again, you're an experienced law enforcement

12  investigator.  If a search warrant is done at your house

13  against illegal drugs, money, cash, why would I go into hiding

14  because of something at your house?  Why would Dent go into

15  hiding because of something happening in Salem at somebody

16  else's house?

17  A    I have no idea.

18  Q    Because he was involved in that?

19  A    It would lead to that inference.  But as I checked into

20  this, Mr. Dent was living with his father on Stonegate over in

21  Salem, and to the best of my knowledge, there was never a

22  search warrant that was conducted at the Stonegate residence

23  for items like this.

24  Q    Right.  I didn't ask that.  I'm just saying, why would

25  Dent go into hiding because of someone else's search warrant?

Engle - Cross

```
 1   Because he thought he might get in trouble from that, in that
 2   fashion, and he was probably involved?
 3   A    Possibly.
 4   Q    And if you turn to the next page, 73, at the top, the
 5   very first paragraph is not a full paragraph, about the middle
 6   part, she confirmed she believes Jacob was still selling
 7   cocaine around this time?  Page 73.
 8   A    I'm reading.  Just give me a second, please.
 9   Q    Just making sure we're on the same page.
10   A    Yeah, I've got 73.
11            THE COURT:  This is still the interview with the
12   mother of the victim?
13            THE WITNESS:  Yes.  This is a return, Your Honor.  We
14   spoke with her a couple of times.
15            THE COURT:  Okay.  All right.
16   BY MR. WESTON:
17   Q    About the middle of that --
18   A    I see it, yes, sir.
19   Q    -- she stated she could tell by a text he was still out
20   there selling.  She confirmed it was cocaine he was selling?
21   A    Yes.
22   Q    The next document starting, again, 11,735, Dominique
23   Joyce interview.
24   A    What exhibit number you said?
25   Q    It's the transcription 11,735.
```

Engle - Cross

```
 1  A    Yes.

 2  Q    This is an interview with Dominique Joyce?

 3  A    Yes.

 4  Q    And he was the brother of Devonte Joyce?

 5  A    That's correct.

 6  Q    So he's not the one in the vehicle; it's that guy's

 7  brother?

 8  A    That's correct.

 9  Q    At page, I'll just use the last three, 749, it's about

10  halfway through, 11749 --

11  A    Yes.

12  Q    -- near the top you ask, "Have you ever seen Ryan,"

13  meaning Ryan Dent, "with any weapons?"  And the answer is,

14  "Yes, an AR-15," right?

15  A    What question?  What question number is that?

16  Q    119.  Q 119 and A for answer.

17  A    Yes.

18  Q    An AR?

19  A    Yes.  It said, "AR maybe."

20  Q    And remind the Court what type of weapon was found along

21  that path that people ran away.

22  A    It was an AR-15, .22 caliber.

23  Q    A little further down, questions 122 through 124, he

24  confirms Jake had a gun, right, Jacob Aldridge carries a

25  weapon?
```

Engle - Cross

1   A    Yes.  I asked him if he had a gun and he answered, "Yes,

2   Jake had a gun."

3   Q    And if you look at page 752 through 753, the very bottom

4   question on 752 and the top answer on 753, the gun -- the

5   bottom, the question they're asking, "Is anybody strapped in

6   that car?"  Meaning the car with Jake Aldridge, and everybody

7   else being strapped meaning have a gun.

8        The next page, 753, he answers Jake probably had his gun

9   in his car, right?

10  A    Yes.

11  Q    If you turn over to 757, at the top of that the question

12  is asked about Jake and the lifestyle of drugs and selling,

13  and he answers, yes, to his knowledge he's selling, the top of

14  757.

15  A    I see that, yes, sir.

16  Q    The next document is U.S. Attorney's Document 0043.  It's

17  supplement 100 by Detective Bridges, dated July 16, 2018.  It

18  starts about halfway down the page.  0043.  It's just one

19  page.

20  A    Yes.

21  Q    Are you familiar with this narrative?

22  A    Yes, I am.

23  Q    And is it by a source or by a witness, or can you not

24  disclose that?

25  A    I can say it's by a source, but I don't know -- that's

Engle - Cross

```
 1  all I can say on that.
 2  Q    Would you say this is pretty much -- fairly describes
 3  what occurred, pretty accurate as to what occurred?  What it
 4  says is Jake, the victim, was the driver of the car, along
 5  with Dent, McCadden, and Joyce.  They went to the Eastern
 6  Avenue to rob the individuals there.  An argument occurred
 7  previously in the day over marijuana.  Dent possessed an AK-47
 8  rifle, McCadden possessed what's believed to be a Mac-10, and
 9  Joyce was in possession of .40 caliber pistol.  Three people
10  in the car out of five were armed, correct?
11  A    That's what the report says, yes.
12  Q    They pull up to the residence where they're seen, met by
13  gunfire, and they started to run and continue shooting.
14  McCadden and Joyce fell straight down a hill like you've
15  already testified to, correct?
16  A    That's correct.
17  Q    A .40 caliber pistol, and that's similar with a Glock
18  .40, that's what Jake Aldridge possessed, right?
19  A    We didn't find one, but we knew that Jake had a pistol --
20  Q    Right.  Well --
21  A    -- a .40 caliber at one time.
22  Q    -- this may help the Court understand why it wasn't
23  found, perhaps.  A .40 caliber pistol was thrown in the woods
24  at the intersection of Wallace and Osborne Street, Northeast.
25  That's near what we're talking about, right?
```

Engle - Cross

```
 1  A    Yes.   It's three -- about two and a half blocks away from
 2  the residence.
 3  Q    A neighbor advised the day after the shooting a black
 4  male and a black female were standing in the woods searching
 5  for something, right?
 6  A    Yes.
 7  Q    And since this was going on, it says, as I read this, law
 8  enforcement keeps looking, and that's when they find behind
 9  1817 Eastern the black AR-15 style rifle lying in the grass
10  wood line?
11  A    That's correct.
12  Q    If you turn to the next document I'll reference as
13  starting U.S. Attorney's Office 107, that goes through 109.
14  And there's an additional document, because it's an interview
15  with the same person, a second interview with the same person,
16  which is 134 to 136.  It should be, hopefully, clipped
17  together.
18  A    Yes.
19  Q    And this is an interview of a witness, a John Stover,
20  right?  He's just a witness?
21  A    Yes.
22  Q    And he's a witness because it's his AR-15?  That started
23  out to be his, right?
24  A    That is correct.
25  Q    And who did he give it to?
```

Engle - Cross

1  A    Mr. Dent.

2  Q    Ryan Dent.  This is the man that gave Ryan Dent the AR-15

3  that is suspiciously similar to the one found on the scene, or

4  near the scene?

5  A    No, it is that firearm.

6  Q    It is.  The firearm that was found, that Ryan Dent is

7  known to have been given from John Stover, was found nearby?

8  A    Yes, sir.

9  Q    Now, you showed us a video earlier --

10          THE COURT:  It is not just similar, it is the gun?

11          THE WITNESS:  It is the firearm.

12          MR. WESTON:  It is the firearm.

13          THE WITNESS:  Mr. Stover produced the receipt with

14  the serial number.

15  BY MR. WESTON:

16  Q    Now, when you look at that grainy midnight video, you

17  can't see somebody running with AK-47 or firearms in their

18  hand, can you?

19  A    No, sir.

20  Q    It sure seems they were, though, doesn't it?

21  A    You're asking me to speculate on that and I cannot.  I

22  cannot see firearms as they're running away.

23  Q    But there's no doubt that people are saying, your

24  evidence shows, that people that came back that night intended

25  to commit an armed robbery, had firearms, and as luck would

Engle - Cross

1    have it, the AR-15 that Dent possessed was found nearby after,

2    in the area where he ran away?

3    A    That is true.

4    Q    And the reason Mr. Stover came forward is because he had

5    heard rumors that the AR was used in this, so he wanted to

6    come forward to make sure his name or his information was

7    given to the police, because his name is coming out in this?

8    A    It was going to, yes.

9    Q    And then if you look over at the next page, 108, he

10   apparently has some information he was given.  He also about

11   two-thirds of the way down, his take on this is Jake got

12   addicted to the lifestyle the last few months and was fairly

13   deep into it, meaning drug dealing.  He was slinging cocaine

14   unknown for who or where.  And then the next paragraph, Jake

15   owned a Glock 9mm.

16   A    Yes, which is not consistent with what the source stated.

17   Q    But it's a Glock?

18   A    It's a Glock.

19         THE COURT:  Glock 9mm is different from a Glock .40?

20         THE WITNESS:  Yes, sir.

21   BY MR. WESTON:

22   Q    It's certainly possible he owned two.  But we're clear

23   it's a Glock?

24   A    Yes.

25   Q    And down towards the bottom, about seven or so --

Engle - Cross

1   A    Same page?

2   Q    -- lines up, Stover says he's pretty sure he thought they

3   all had guns in the car?

4   A    Yes.

5   Q    Going to the next page, 109, his father, Stover, Sr., is

6   involved with him giving information to police because --

7   well, he is, he's also talking to police, right?

8   A    Yeah, Mr. -- yes.

9   Q    About halfway down the page, July 21, he calls and gives

10  information about what his son John is telling him, right?

11  A    Yes.

12  Q    And he is saying that Ryan Dent told his son John a

13  version of events, correct?  And he is relaying that version

14  of events, correct?

15  A    Yes, sir, 11 days after the incident.

16  Q    Right.  Ryan told John that Ryan shot out the windows in

17  the house; that Ryan told John he ditched the gun in the

18  bushes, but he also told John he ditched a gun near a house

19  with some woods, so it's clear he ditched it, but somewhere

20  nearby. · And some kind of allegation about a robbery, that

21  Jake may have robbed somebody of -- armed robbery of $10,000,

22  towards the bottom of that paragraph?

23  A    Yes.  Yes.

24         THE COURT:  Whose statement is this?  Is this still

25  the source?

Engle - Cross

```
 1              THE WITNESS:  No, sir.  We're three people beyond the
 2   source.  This is Mr. Stover, Sr.
 3   BY MR. WESTON:
 4   Q    Mr. Stover, Sr. --
 5              THE COURT:  So Dent tells John Stover; Stover tells
 6   Stover, Sr; Stover, Sr. makes the statement?
 7              THE WITNESS:  Yes.
 8              THE COURT:  Hearsay, hearsay, and then we get it.
 9   But hearsay is admissible at a sentencing hearing, so I'm
10   hearing it.
11   BY MR. WESTON:
12   Q    So then you also conduct another follow-up interview with
13   him on September 23rd.  So this is around -- this is page
14   00134, again of the Stovers.  Down towards the bottom of that
15   page.
16   A    The date of that, sir?
17   Q    It's page 134.  If you go down to the last full
18   paragraph, it says, on September 23rd, 2019 --
19   A    Yes.
20   Q    -- you and Detective Dickerson interviewed the Stovers
21   again?
22   A    Yes.
23   Q    And, again, now they're both there giving you
24   information; is that right?
25   A    Yes.
```

Engle - Cross

1  Q    And the information is Dylan Lowe set up a buy through

2  one of the people in the house, right?

3  A    Yes.

4  Q    A Jake, a Ryan Dent.  Is that a mistake who's involved

5  there, or is there somebody named with them?  There's three

6  people named, but one I thought was a person in the house.

7  A    It was.

8  Q    Okay.

9  A    This information is not wholeheartedly correct that was

10 supplied.

11 Q    But this comes in and says the sale went bad so they

12 decided to go back and rob them.

13 A    That's what this says, yes.

14 Q    And then comes in the next page, 135, some specific

15 information about the events; is that right?

16 A    Are you talking about 135, top paragraph?

17 Q    The next page, 135, right.

18 A    Yes.

19 Q    The page goes into more specifics about the allegations.

20 A    Yes.

21 Q    And that's CJ -- that's Carrington -- has Jake's gun, and

22 Dent has the gun that Stover gave him, the AR, right?

23 A    Yes.

24 Q    Dylan is in the front with no gun, and Joyce had the

25 guns, probably 9mm.  The initial deal was done over Snapchat,

Engle - Cross

1  and they're aware that Dent's group, the people in the car,

2  telling everybody they were going for a blunt walk.  They're

3  aware of the lie, correct?

4  A    Yes.

5  Q    In fact, this says the first time they went there they

6  intended to rip them off, but that fell through because the

7  people were in the house were too wary, they didn't give them

8  the drugs so they could just drive away with them.  Then they

9  went back a couple of hours later to do an armed robbery,

10 correct?

11 A    That's what it was said, yes.

12 Q    Down towards about the bottom of that first full

13 paragraph there -- not full paragraph, the first paragraph, he

14 states, "At about 6:00 a.m., CJ," again Carrington, "went back

15 and picked up two guns in that area," right?

16 A    That's what the report says, yes.

17 Q    The next paragraph -- and, again, as best I can tell,

18 both senior and junior are there.  It doesn't really say which

19 one is saying which, but both senior and junior are there

20 giving this information.  And it appears maybe junior is

21 saying this, but it looks like he says that he was told,

22 meaning I think by Ryan Dent, right?

23 A    He said --

24 Q    It doesn't really say who exactly said this, but I think

25 the inference was Ryan Dent from the way it was written.  But

Engle - Cross

```
 1  I'm not sure of that.  Do you know who was telling them this?
 2  A    I do not.
 3  Q    What he describes is Dylan is in the front seat.  Dylan
 4  went to the door and knocked out the front window.  That's
 5  consistent with somebody saying a brick or something was
 6  thrown through the front window, right?
 7  A    Yes.
 8  Q    He states the door was still open from that.  Had been
 9  sitting -- you know, somebody went in, I guess, from the
10  couch.  The door is still open because somebody went in from
11  the couch?
12  A    Yes.
13  Q    Now Dent realizes there was a guy at the front door with
14  a gun, so he pushes Dylan out of the way, right?
15  A    That's what the report says, yes.
16  Q    So they're not down the street, they're there at the
17  residence?
18  A    Yes.
19  Q    States the same -- JR states the three in the back had
20  guns.  In the interviews, McCadden, Joyce and Dent were in the
21  back of the car.  Jake and Dylan didn't have guns.  And that
22  the next paragraph down, it talks about the two-hour lag time
23  between the events when they came back.  There were no guns
24  the first time, but the second time was the AR.  James had the
25  Glock, possibly the .40 and another pistol, right?
```

Engle - Cross

```
 1  A    That's what it says, yes.
 2  Q    The next paragraph down, again -- now this is clearly --
 3  this is why I made the inference before it's Dent saying this.
 4  This next paragraph says, "JR states." So junior states that
 5  Dent is telling him this. Dent told him he shot, but didn't
 6  say how many times, and he threw the gun by a house across the
 7  street. Other guns were ditched or retrieved the next day,
 8  but believes Jake's .40 caliber is still out on the streets,
 9  right?
10  A    Yes.
11  Q    Down at the bottom -- now, recall there were witnesses
12  from the area, the residents, is saying somebody came back to
13  the car, right? We've already discussed that earlier on,
14  somebody came back to the car?
15  A    Yes.
16  Q    Down at the bottom, JR states that Dent said he tried
17  shaking Jake after the car wreck and described him leaning
18  over in the passenger seat. So Dent says, apparently, he went
19  back to the car?
20  A    Yes. And when Mr. Dent was asked that, he stated he
21  didn't go back to the car.
22  Q    He denied it?
23  A    Yeah. He was actually gone, and you can see that in the
24  video, the one believed to be Dent. And if it was any one of
25  those four, they were completely out of the area prior to
```

Engle - Cross

```
 1   Jake's car crashing.
 2   Q    You don't know -- well, as to Dent, he's the only one --
 3   he got away so to speak.  He wasn't caught?
 4   A    Correct.
 5   Q    You don't know where he went?
 6   A    Correct.
 7   Q    He could have went back to the car?
 8   A    But he went through 40 seconds prior to Jack's car crash.
 9   Q    And why do you think then he couldn't go back to the car?
10   A    I'm not saying that he couldn't go back to the car, but
11   Mr. Dent stated he did not go back to the car when we spoke
12   with him.
13   Q    Mr. Dent also said he had no firearm, didn't he?
14   A    Yes, he did.
15   Q    I mean, like we said, everybody was lying at some point
16   about this.  It's really difficult to figure out exactly what
17   happened, isn't it?
18   A    The facts show that individuals were shot.  There were
19   shots fired.  I do not debate or say that individuals didn't
20   shoot back and forth at each other.  But Mr. Aldridge was a
21   recipient of gunfire, and there's nothing that corroborates
22   that Mr. Aldridge was shooting during this incident.
23   Q    That who?
24   A    That Mr. Aldridge was shooting at all during this
25   incident.
```

Engle - Cross

1    Q    You just don't know?

2    A    There's nothing that corroborates it.  There's no

3    evidence to support that.

4    Q    There is rounds, spent casings found on Eastern Avenue?

5    A    Yes.

6    Q    Four of them, right?

7    A    Yes.

8    Q    .40 caliber?

9    A    Yes.

10   Q    And since everybody is lying, it's not clear who shot

11   who, why can't Mr. Aldridge shoot out the window while he's

12   driving away?

13   A    There's no evidence that shows --

14   Q    Well, we know that --

15   A    -- that corroborates that.

16   Q    -- there's no evidence showing that at all.  There's no

17   video of the street.  But if you want to make -- to surmise --

18   if you want to conjecture, you want to say something can't

19   happen, we could say something could happen.  Jake Aldridge

20   could have shot -- put his hand out the window and could have

21   shot as he was driving away?

22            MR. MILLER:  I will object, Your Honor.  This is pure

23   speculation, it's better for argument, and the witness has

24   answered this.

25            THE COURT:  Overruled.  I'll let the witness answer

Engle - Cross

1    the question.

2    A    Can you state the question again, please?

3    BY MR. WESTON:

4    Q    Jake Aldridge could have put out his hand out the

5    driver's side window, because the driver's side window is

6    facing 1642, the residence, the way he was driving, and it's

7    possible he could have shot four times as he's driving away?

8    A    Yes, that would be possible.

9    Q    Somebody shot a .40 caliber down on Eastern somewhere?

10   A    Someone did, yes.

11   Q    And rounds were coming into that house?

12   A    Yes.

13   Q    And you mentioned earlier about the car, you know, moving

14   while being shot?

15   A    Yes.

16   Q    You have no idea from how far away that car was shot, do

17   you?

18   A    Well, it was shot from the --

19   Q    You don't know whether it was shot from 5 feet away,

20   20 feet away, 100 feet away, 75 feet away?

21   A    No.

22   Q    You don't know how far the shots were?

23   A    No.

24   Q    You mentioned -- you know, you likened the residence to,

25   like, a McDonald's fast-food place.  And, you know, obviously

Engle - Cross

1  making the difference, the distinction between like a

2  McDonald's fast food, go up and place an order, get it in five

3  minutes, and I guess sitting in a restaurant and taking an

4  hour to have a dinner, right?

5  A    Yes.

6  Q    How many drug dealers do you know of, you sit in an

7  residence for an hour while conducting a drug transaction?

8  It's much more common to walk up, be sold the drug and walk

9  out quickly?

10  A    It is.  It is common.

11  Q    It's almost all the time exactly what happens?

12  A    No.  I would not agree with that statement, no.

13  Q    So --

14  A    I have -- I have -- I have used informants in the past

15  that have gone and purchased narcotics and have stayed inside

16  of a residence for longer than five minutes.  They've been in

17  a residence for 30 minutes, 40 minutes to purchase narcotics.

18  Q    Like we said, it's more usual the first part what we

19  said?  Usually it's a quick transaction?

20  A    Yes.  But this residence was also a residence that young

21  people would come and smoke and hang out and buy their

22  narcotics and stay and play games at.  We have that through

23  statements and witnesses also.  The two neutral witnesses that

24  were in the apartment had been there for -- back and forth for

25  the last couple of days prior to this and then stayed the

Engle - Cross

```
 1  night.
 2  Q    No doubt about it large quantities of drugs are being
 3  dealt from this apartment building?  There's no doubt about
 4  it, right?
 5  A    That's correct.
 6  Q    And throughout this, you mentioned a significant number
 7  of guns or a different number of guns.  You interviewed Custer
 8  over this, right, Chad Custer, the codefendant?
 9  A    Yes.
10  Q    And he basically said all the firearms are his in some
11  fashion, right?
12  A    Yes.
13  Q    He even described straw purchases and all sorts of stuff
14  obtaining these guns, right?
15  A    That's correct.
16  Q    And if you turn to the next pack, which is Numbers 581
17  through 584, that's an interview with Custer.  Do you have
18  that?
19  A    Yes, sir.
20  Q    And, basically, the synopsis is he also describes a bad
21  afternoon drug deal.  The same group came back, came back at
22  night.  He said something broke in the front window, right?
23  A    Yes.
24  Q    And then shots started being exchanged and fired between
25  them all?
```

Engle - Cross

1   A    Yes.

2   Q    The next packet, U.S. Attorney's numbers -- now, this is

3   63,682 through '687.  And that's an interview of Woods.

4   A    Yes.

5   Q    He also describes similar, bad afternoon drug deal, they

6   came back at night, broke the window.  He describes on 683, he

7   states he went outside and he observes two or three people

8   near the front windows, and two guys near the car, and Jake in

9   the car driver's door area.  Do you see that, paragraph 9?

10  A    Yes.

11  Q    That he holds up a firearm yelling, quote, "What the fuck

12  you guys doing here?" end quote.  And then he sees two muzzle

13  flashes and shots are fired and the exchange is on, right?

14  A    Yes.

15  Q    So something, somebody, if you believe the narrative,

16  broke that window and then the people inside came out, right?

17  A    Yes.

18  Q    And from there, it's kind of you just don't know who to

19  believe.  But what we do know is a shoot-out occurred?

20  A    That is correct.

21  Q    And despite protestations of individuals going for a

22  blunt walk, people in that car were armed, probably three

23  firearms in that car?

24  A    The probability that there were firearms in the vehicle

25  is -- yes.

Engle - Cross

```
 1  Q    Two of which were found?

 2  A    One.

 3  Q    The AR --

 4  A    The AR.

 5  Q    -- is the only one found?

 6  A    Yes.

 7  Q    And that could be because the evidence from the witnesses

 8  in the area, neighbor people saying that in the morning,

 9  6:00 a.m. or so, people came back to scour and retrieve

10  something most likely?

11  A    Possibly, yes.

12  Q    Possibly, the neighbor who said somebody came back to the

13  car that night when it crashed, somebody came right back to it

14  and took something out of the backseat, it could have been a

15  gun?

16  A    Possibly.

17           MR. WESTON:  Judge, may I have one minute to review

18  my notes?

19           THE COURT:  Certainly, Mr. Weston.

20           MR. WESTON:  And, Judge, I didn't use any of the

21  information I submitted as evidence, which was the maps, the

22  Google Maps of the area.  If the Court believes it would help,

23  I certainly would do that, but I thought the government's --

24           THE COURT:  I looked at it all.  I read it all, I've

25  got it, I've considered it for the purposes of sentencings.
```

Engle - Cross

 1  You don't have to submit it as evidence here.  It's attached

 2  to your sentencing memorandum; I looked at it all.

 3          MR. WESTON:  I just wanted to make sure that the

 4  Court understood the geography of the area we're talking

 5  about.

 6          THE COURT:  I appreciated that, because I was

 7  interested in that.

 8          MR. WESTON:  Could I play the government's video of

 9  that car, please, Your Honor, driving up, the initial part of

10  that?

11          MR. MILLER:  I think it's Exhibit 9.

12          THE COURT:  Sure.

13  BY MR. WESTON:

14  Q    The evidence, you understand, is lights were turned out

15  as they drove up, and then people got out of the car as it

16  continued to approach the house, right?

17  A    My understanding is the lights were extinguished just

18  before it pulls in and goes up, it stops, and people get out

19  of the car.

20  Q    Right.  That's about all we know.  But something -- it --

21          MR. WESTON:  Show the video, please, part of when the

22  car first starts to drive up that hill.

23      (Video is played.)

24          MR. WESTON:  Okay.  Could you continue a little bit,

25  please?  Stop it now.

Engle – Cross

```
 1  BY MR. WESTON:
 2  Q    The lights were on there.  Did they get turned off --
 3           COURT SECURITY OFFICER:  It's not showing here.
 4           MR. WESTON:  You can't see it?
 5           COURT SECURITY OFFICER:  It's not showing here.
 6           THE COURT:  Kristin, it's not showing on the witness.
 7           THE CLERK:  I'm so sorry.
 8           THE WITNESS:  It just came up.
 9           THE COURT:  Try it again.  Mary, run that again,
10  would you?
11           (Video is played.)
12  BY MR. WESTON:
13  Q    I'm not sure it shows it, but can you tell the lights
14  getting turned off by the light reflections or not?
15  A    It appears that the lights were turned off.
16  Q    Right there the lights were turned off weren't they?
17  A    Yes.
18  Q    Because all the lights went dark on the front of that
19  car?
20  A    The headlights.
21  Q    Correct, the headlights.
22  A    Yes.  It still appeared --
23  Q    -- (crosstalk) brake lights.
24  A    Right.  It still appeared to have running lights on the
25  front of the vehicle.  But, yes, the headlights were
```

Engle - Cross

1   extinguished.

2   Q    So clearly -- and that's the entrance to go up the 20 to

3   30 feet to this line of residences, correct?

4   A    Yes.

5   Q    It's dark out, it's night.  Can you think of any reason,

6   in your experience, why people would turn the lights out while

7   driving?

8   A    Well, there are residents up there.  There are other

9   residences up there.

10  Q    Might it be not to be seen by the people in the house?

11  A    Possibly.

12  Q    Might it be so that somebody --

13  A    It could be that they wanted --

14  Q    -- in the house you're trying to go rob doesn't see you

15  coming?

16  A    Say it again, please.

17  Q    Might it be so that people in the house you're going to

18  rob don't see you coming by your headlights?

19  A    Possibly.  And it could possibly be that they turned them

20  off because there are families that live up there in other

21  residences and didn't want to shine the lights into their

22  residence.

23  Q    But the statements you got from the people in the car

24  were that they parked and the lights go off because they

25  parked?  Stuff like that, right?

Engle - Cross

```
 1  A    I did not get any statements that we parked and the
 2  lights went off.
 3  Q    You don't recall anybody in the car talking about lights
 4  being turned off?
 5  A    No.
 6  Q    The inferences you made, possibility of Mr. Harvey being
 7  involved in threats, you eventually stated -- I'll make sure
 8  my notes are correct -- something about a bomb and but he
 9  found out about that afterwards?
10  A    The bomb thing, yes.
11  Q    Right.
12  A    And the photograph also.
13  Q    And you said something about him saying or a text or
14  something that he said, "Don't worry about it.  I'll take care
15  of it," right?
16  A    Yes.
17  Q    So that would seem to be consistent with, you know, if
18  there was a threat, he is going to resolve that so you're not
19  threatened.  Would not what that statement mean?
20  A    It could lean to that inference, but the threat had
21  already been made.
22  Q    Well, he said, "Don't worry about it.  I'll take care of
23  it" to the people that were threatened?
24  A    Yes.
25  Q    You're not saying that's another threat to them, "Don't
```

Engle - Cross

1 worry about him; I'll do it"?  That's a statement that, "I'll

2 resolve this threat," isn't it?

3 A    That's a statement that he would take care of it.  But

4 the threat had -- like I said, the threat had already been

5 made.  They were already scared.  They were already scared.

6 So I can't say that because he said, "I'll take care of it"

7 they're no longer scared.

8 Q    I didn't ask if they were no longer scared.

9 A    Right.

10 Q    I asked if that's a statement of intent that "I'm going

11 to try and resolve the threat against you"?  I'm going to try

12 and solve it, not do it?

13 A    Correct, I would agree with that.

14        MR. WESTON:  I have no other questions, Your Honor.

15        THE COURT:  Thank you, Mr. Weston.

16        Is there any redirect of this witness?

17        MR. MILLER:  There is, Your Honor.

18        THE COURT:  Okay.  What we'll do is, we'll do the

19 redirect of this witness and then we'll take a brief recess.

20 Does that suit you-all?

21        MR. MILLER:  It suits the government, Your Honor.

22        THE COURT:  Does government have additional evidence

23 after the detective?

24        MR. MILLER:  We do not.

25        THE COURT:  Okay.  Let's do redirect.  And if

Engle - Redirect

```
 1  Mr. Weston has any additional cross, I'll allow that, and then
 2  we'll take a brief recess.
 3                    REDIRECT EXAMINATION
 4  BY MR. MILLER:
 5  Q    Detective Engle, of the witnesses that we know were there
 6  that evening involved in the incident, or witnessed and
 7  admitted that --
 8  A    Yes.
 9  Q    -- has any person said that Jake Aldridge discharged a
10  weapon at any time, or even had a weapon?
11  A    No.
12  Q    That includes his four friends?
13  A    Correct.
14       THE COURT:  Well, none of those guys said they fired
15  any shots either, did they?
16       THE WITNESS:  That's correct.
17       THE COURT:  That's right.
18  BY MR. MILLER:
19  Q    They certainly didn't try to pin it on Jake?
20  A    No, sir.
21       THE COURT:  And I don't think the shell cases just
22  fell out of their pocket onto Eastern Avenue, did it?
23       THE WITNESS:  No, sir.
24       THE COURT:  It's not like -- go ahead.
25  BY MR. MILLER:
```

Engle - Redirect

1   Q    They don't implicate Jake Aldridge?

2        THE COURT:  We're not arguing.  You just ask your

3   questions.

4        MR. MILLER:  Yes, Your Honor.

5   BY MR. MILLER:

6   Q    The two girls don't say that Jake Aldridge fired any

7   weapons?

8   A    No, sir.

9   Q    And none of the defendants you have talked to have

10  implicated Jake in the violence as far as discharging a weapon

11  or having a firearm?

12  A    That's correct.

13  Q    Mr. Weston read off a bunch of different interviews.

14  Just as a general matter, what is the reliability of that

15  information?

16       MR. WESTON:  Objection, Your Honor.  How is he going

17  to gauge reliability of --

18       THE COURT:  I'll sustain the objection.

19  BY MR. MILLER:

20  Q    Were there multiple statements that Mr. Weston commented

21  on that were based on rumor and innuendo?

22  A    Yes, sir.

23       MR. WESTON:  Your Honor, again, I'm going to object.

24  There are police reports, information.  His opinion -- he just

25  asked it a different way, that's all.  I object to it, Your

Engle - Recross

```
 1   Honor.
 2             THE COURT:  I'll sustain the objection.
 3             You probably get a lot of different stories in every
 4   police investigation, don't you?
 5             THE WITNESS:  Yes, sir, especially on homicides.
 6             THE COURT:  And it's your job to try to figure out
 7   what the truth is?
 8             THE WITNESS:  Yes, sir.
 9             MR. MILLER:  No further questions, Your Honor.
10             THE COURT:  Thank you.  Okay, Mr. Weston, do you have
11   any further questions for this witness?
12             MR. WESTON:  Since those questions were asked that
13   way, Your Honor.
14                         RECROSS-EXAMINATION
15   BY MR. WESTON:
16   Q    Isn't it fair to say you would consider or are
17   considering trying to bring charges for attempted Hobbs Act
18   robbery against the people in the car?
19   A    That is still under investigation, but, yes.
20             MR. WESTON:  No other questions, Your Honor.
21             THE COURT:  All right.  Thank you.  This witness may
22   stand down.  Let's take about a ten-minute recess and then we
23   will resume with the sentencing hearing.  Thank you all.
24   We'll be in recess for ten minutes.
25        (Recess taken from 4:26 p.m. until 4:45 p.m.)
```

Smith - Direct

1        THE COURT:  All right.  Does the government have any

2   other evidence you would like to present?

3        MR. MILLER:  No further evidence from the government.

4        THE COURT:  Does the defense have any evidence to put

5   on?

6        MR. WESTON:  We would call one witness, his cousin

7   Brittany Smith, and it would be just for sentencing purposes.

8        THE COURT:  I am happy to hear from Mrs. Smith.  And

9   she also sent me a letter.

10       MR. WESTON:  She did.

11       THE COURT:  That I read.

12       BRITTANY N. SMITH, DEFENDANT'S WITNESS, SWORN

13                    DIRECT EXAMINATION

14       THE COURT:  Come on up, Ms. Smith.  Good afternoon.

15       THE WITNESS:  Good afternoon.

16  BY MR. WESTON:

17  Q    Ms. Smith, would you identify yourself for the Court and

18  for the record, please?

19  A    I'm Brittany Natasha Smith.

20  Q    I'm going to ask you questions, the United States might,

21  the Judge might.  Speak up into the mic so we can all hear

22  you, okay?

23  A    Okay.

24  Q    How do you know Mr. Harvey?

25  A    Darion is my youngest cousin and we grew up together.  We